In re CHURCHFIELD MANAGEMENT
& INVESTMENT CORPORATION,
Debtor.

**Bankruptcy No. 84 B 7409.**

United States Bankruptcy Court,
N.D. Illinois, E.D.

March 10, 1989.

See also, Bkrtcy., 98 B.R. 893.

John Umana, Swidler & Berlin, The Washington Harbour, Washington, D.C., Martha L. Ashenhurst, Portes, Sharp,

Herbst & Kravets, Ltd., Chicago, ILL., Special Litigation counsel for Estate.

Gerald D. Chiss, Cohon, Raizes & Regal, Chicago, ILL., Special Local Litigation Counsel for Estate.

Michael L. Molinaro, Daniel M. Pelliccioni, trustee, Katten Muchin & Zavis, Chicago, ILL., for trustee.

MEMORANDUM OPINION AND RULINGS ON ALL APPLICATIONS FOR PROFESSIONAL FEES IN EXCESS OF LODESTARS AND ON TRUSTEE'S APPLICATION

JACK B. SCHMETTERER,
Bankruptcy Judge.

TABLE OF CONTENTS

| | | Page |
|---|---|---|
| A. | Introduction | 841 |
| B. | Standards under Fee Shifting Statutes and in Bankruptcy Generally | 843 |
| C. | Swidler & Berlin Application | 850 |
| D. | Cohen, Raizes & Regal Application | 865 |
| E. | Portes, Sharp, Herbst & Kravets Application | 869 |
| F. | Katten Muchin & Zavis Application | 873 |
| G. | Trustee Application | 888 |
| H. | Conclusion | 893 |

## A. INTRODUCTION

### 1. *Case History.*

Prior to the filing of this Chapter 11 proceeding, Churchfield Management & Investment Corporation ("Debtor") was in the business of owning, developing, syndicating and managing real estate located throughout northern Illinois. As part of its business, Debtor organized eight (8) limited partnerships ("Partnerships") to which the Debtor sold certain residential real estate. The Debtor was the sole general partner or a co-general partner in each of the Partnerships.

Following a long and stormy period during which Debtor remained in possession, this Court approved appointment of Daniel M. Pelliccioni ("Trustee") as Chapter 11 Trustee for Debtor's estate over Debtor's strenuous opposition. Upon appointment, the Trustee took possession of all of the Debtor's property and supervised its business while commencing a liquidation of the Debtor's assets. Pursuant to the Trustee's Second Amended Liquidating Plan of Reorganization ("Plan"), which was confirmed by this Court, Trustee has completed the liquidation of all assets of the Debtor. As part of that program, the Trustee has sold the following real estate of the Debtor:

| Location | Sales Price |
|---|---|
| Crestwood Village Cresthill, Illinois | $5,426,000.00 |
| 115 and 125 Twin Oaks Drive Joliet, Illinois | $1,400,000.00 |
| 2046–48 W. Fargo Avenue Chicago, Illinois | $ 155,000.00 |
| 1426–28 W. Jonquil Terrace Chicago, Illinois | $ 62,000.00 |
| 1015 Central Road—# 119C Arlington Heights, Illinois | $ 71,000.00 |
| 1015 Central Road—# 419C Arlington Heights, Illinois | $ 72,000.00 |

Excluding funds held in reserve accounts relating to the sale of properties owned by the Partnerships, the Trustee, as of July 28, 1988, held $2,332,000.00 invested for future distribution to administrative claimants and creditors of the Debtor. The Trustee has already distributed approximately $9,274,484.00 to creditors and parties in interest from sale proceeds and other assets of Debtor's estate.

The Trustee has also received approximately $10,520,000.00 pursuant to settlement of a Class Action lawsuit against Winston & Strawn, Arthur H. Evans, Ltd. and others. Trustee's July 28, 1988 Application for Interim Compensation, p. 2–4. About $415,000.00 was paid out pursuant to interim fee orders, and an additional $2,011,197.50 was authorized on January 30, 1989, as interim professional payments against fees yet to be allowed.

This Court participated in the many conferences leading to settlement of the Class Action which then pended in District Court. As part of that settlement process briefs of both sides in that District Court case were reviewed along with statements of evidence obtained by the parties in litigation. This Court thereby became familiar with details of the legal and factual issues of that case as well as the dynamics of settlement negotiations. Following approval of the settlement here and in the District Court, all appeals have been withdrawn or dismissed. Therefore, award of fees and distribution of dividends to creditors is in order.

### 2. *Claims for Fees in Excess of Lodestars.*

The following parties seek almost $2,000,000 in enhancements or multipliers over their lodestars:

| | | Enhancements or Multiplier Sought | Total Lodestar Claimed in Application[1] |
|---|---|---|---|
| a. | Swidler & Berlin (Special Litigation Counsel) | $1,555,039.50 (multiplier) | $1,555,039.50 |
| b. | Cohon, Raizes & Regal (Special Litigation Local Co–Counsel) | $ 44,293.50 (multiplier) | 59,058.00 |
| c. | Portes, Sharp, Herbst & Kravets (Special Litigation Co–Counsel) | $ 106,728.00 (multiplier) | 106,728.00 |
| d. | Katten Muchin & Zavis (Attorneys for Trustee) | $ 201,926.00 (enhancement) | 793,727.71 |
| **TOTALS REQUESTED** | | **$1,907,987.00** | **$2,514,553.21** |

The accountants employed by Trustee also initially requested enhancement, but withdrew their request at the hearing on their application. That application is therefore discussed in a separate opinion along with many other fee applications.

Each application discussed here must be reviewed under the respective standards applicable thereto. As discussed below, these standards differ depending on whether considered under "fee shifting" standards or "common fund" standards. This opinion concludes that the "fee shifting" standards for enhancement apply generally in bankruptcy cases to all counsel including special litigation counsel, but class action litigators who represent Debtor and a class of Debtor's creditors on a contingent fee basis may be considered under "common fund" standards for fees. Pursuant to the analysis below, the Court finds that only the firms of Swidler & Berlin, and Portes, Sharp, Herbst & Kravets should be considered here under common fund standards. The other firms are properly considered under standards applicable to "fee shifting" cases, thereby applying the factors required generally for fee enhancement in bankruptcy.

The rulings set forth herein follow review of voluminous applications and objections that were filed, and many days of hearings on all fee applications including a separate hearing on each application discussed hereinbelow. All applicants and objectors were given full opportunity to offer any evidence and argument, and all parties rested as to each application. Accordingly, this Opinion and the rulings contained herein will stand as this Court's Findings of Fact and Conclusions of Law following each said hearing.

A number of other fee applications were likewise heard and will shortly be decided by separate opinions and rulings. However, the application of Mr. Pelliccioni as Trustee for Debtor is considered here because it so closely relates to the application of his firm.

For all fee questions, this Court has core jurisdiction under 11 U.S.C. §§ 326 and 330,

1. Lodestar for entire case.

and 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(2), and the General Order of Reference of the District Court referring all bankruptcy matters to judges of the Bankruptcy Court for this District.

## B. STANDARDS UNDER FEE SHIFTING STATUTES AND IN BANKRUPTCY GENERALLY.

### 1. *Applicable Supreme Court Authority under Fee Shifting Statutes.*

In *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), the Supreme Court considered whether a 50% fee enhancement was proper. After finding no merit to the argument that an upward adjustment is never permissible, the Court held that the district court had abused its discretion in awarding enhancement in that case.

The suit was brought on behalf of a statewide class of Medicaid recipients whose benefits had been automatically terminated when they were no longer eligible for Supplemental Security Income. The recipients did not have the benefit of a hearing or notice before their Medicaid benefits were terminated. After receiving a judgment in favor of the class, the respondents sought an award of reasonable attorney fees under Title 42 U.S.C. § 1988. The fee request included a 50% bonus. The district court granted this bonus because of the quality of representation, the complexity of the issues, the riskiness of success, and the great benefit to a large class that was achieved. The court of appeals affirmed.

The Supreme Court decided that an enhanced award may be justified only in some cases of exceptional success. The burden of proving that such an enhancement is proper is on the fee applicant. Rejecting the district court's reasons for enhancing the fee, the Supreme Court found that neither complexity nor novelty of the issues was an appropriate basis on which to enhance. Those factors were found to be adequately reflected in the lodestar based on billable hours. Where special skill and experience of the attorney require that attorney to spend less time on the case than would be normally required, the Court found such skill reflected in the higher hourly rates of that attorney. It also found that the quality of representation is generally reflected in the hourly rate. Therefore, fee enhancement because of quality of representation is justifiable only in rare cases "where the fee applicant offers specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was 'exceptional'." *Blum,* 465 U.S. at 899, 104 S.Ct. at 1549. No such evidence had been offered in that case. In light of *Blum,* a showing of good results obtained is not by itself the basis for fee enhancement.

In a significant footnote, it was also made clear that the number of persons benefited was not a weighty consideration in calculation of fee enhancement. *Blum,* 465 U.S. at 900 n. 16, 104 S.Ct. at 1549–50 n. 16.

The *Blum* decision did not rule on whether the risk of not prevailing, and therefore not recovering any attorney's fees, may ever justify an upward fee adjustment. However, Justice Brennan in his concurring opinion joined by Justice Marshall, found that the risk of not recovering any attorneys fees is a proper basis on which to award an upward fee adjustment.

The Supreme Court again addressed fee enhancement in *Pennsylvania v. Delaware Valley Citizens' Council For Clean Air (I),* 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986) ("*Delaware Valley I*"). Restating the standards adopted in *Blum,* the Court held that an upward adjustment for superior quality was not warranted in that case. Under the *Blum* standard, Delaware Valley's counsel was found to have presented no specific evidence as to how the quality of services or results obtained were outstanding. Furthermore, the Court noted that the district court had eliminated a large number of hours on the grounds that they were unnecessary, unreasonable, or unproductive. Also nearly one-third of the hours for which an enhancement was sought were being compensated at an hour-

ly rate for work "that could have been done by an attorney working at the associate level" rather that work found to be the "most difficult". The latter two findings were further evidence to the Court that the work of Delaware Valley's counsel was not of such superior quality as to merit fee enhancement. The Court left undecided the issue whether enhancement was proper based on the attorney's risk of loss.

In *Pennsylvania v. Delaware Valley Citizens' Council For Clean Air (II)*, 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) (*"Delaware Valley II"*), Justice White, writing for the Court, first noted that adjustment to the lodestar for delay in payment was consistent with typical fee-shifting statutes. Second, the Court noted that if a fee is non-contingent it is improper to adjust the lodestar because the case is a risky one since the attorney has not assumed the risk of nonpayment. Justice O'Connor agreed with the foregoing, but not with the rest of Justice White's decision which was supported only by a plurality including the Chief Justice, and Justices Powell and Scalia. The plurality found that the attorney's risk of losing a lawsuit and thus not recovering fees was an impermissible basis for increasing the amount of the fee. The plurality primarily based that decision on three reasons:

1. Enhancing fees for risk of loss forces losing defendants to compensate plaintiff's lawyers for not prevailing against defendants in other cases.

2. Such enhancement penalizes the defendants who have the strongest case and in theory authorizes the highest fees in cases least likely to be won, and thus encourages the bringing of more risky cases.

3. Because no counsel can ever be completely sure that a case will be won, enhancing fees for assumption of the risk of nonpayment would justify some degree of enhancement in almost every case.

*Delaware Valley (II)*, 107 S.Ct. at 3086.

The Court found that a lawsuit is considered "risky" to the attorney because of the novelty and difficulty of the issues involved, and the possibility of protracted litigation. Thus, whenever an attorney wins that victory is attributable to the lawyer's legal skills, experience, and hours of hard work. All those factors were found to be adequately reflected in the number of hours and hourly rates used in computing the lodestar. Therefore, a further enhancement would be a windfall for the attorney.

Because the dissent and Justice O'Connor found that fee enhancement for attorney's risk of loss was not precluded, the plurality continued its analysis. Assuming that such enhancement was not precluded by fee-shifting statutes, the plurality stated that the decision whether to enhance or not for risk of loss was left to the informed discretion of the trial courts. However, the plurality found it appropriate to adopt the approach followed in *Blum* in order to guide trial courts in determining when enhancement is proper. Under *Blum* standards, risk of loss should only cause fee enhancement in exceptional cases because of facts supported by evidence in the record and specific findings of the court. Such evidence and findings that may merit enhancement must show that in the absence of likelihood of enhancement for risks the plaintiff would have faced substantial difficulties in finding counsel in the relevant professional market. Citing *Lewis v. Coughlin*, 801 F.2d 570, 575 (2nd Cir. 1986), the plurality noted that this determination should be an objective one based on the bar's likely response to the case's pretrial merits at the beginning of the litigation. Additionally, the plurality found that if a risk-enhancement is proper such enhancement, as a general rule, should not be greater than ⅓ of the lodestar.

In the concurring opinion Justice O'Connor agreed with the dissent that Congress did not intend to foreclose consideration of risk and contingency in setting a reasonable fee under fee-shifting statutes. Also, she agreed with the dissent, "that compensation for contingency must be based on the difference in market treatment of contingent fee cases *as a class*, rather than on an assessment of the 'riskiness' of any

particular case." *Delaware Valley (II)*, 107 S.Ct. at 3089 (emphasis in original).

On the other hand, Justice O'Connor joined in the plurality's decision that risk-enhancement was not proper in the circumstances of that case. The Justice agreed that enhancement should not be based on the novelty and complexity of the issues raised, or the potential for protracted litigation (referred to by O'Connor as legal risks). Furthermore, she agreed that enhancement is proper only where it is established that the prevailing party would have faced substantial difficulty in finding counsel were it not for risk-enhancement.

Justice Blackmun dissented joined by Justices Brennan, Marshall, and Stevens. The dissent found that enhancement is appropriate whenever an attorney and client have been unable to mitigate the risk of nonpayment. A court must determine whether an attorney has been able to mitigate the economic risk of nonpayment, and whether specific aspects of the case have aggravated that economic risk. Aspects that the dissent found to aggravate the economic risk include delay in payment, and a particular attorney's circumstances such as being a sole practitioner.

## 2. Seventh Circuit and Other Authority on "Fee Shifting" Standards

Prior to the *Delaware Valley* cases, the Seventh Circuit determined that risk of loss did not justify an upward adjustment to fees. In *McKinnon v. City of Berwyn*, 750 F.2d 1383 (7th Cir.1984), the court stated that the fundamental problem of risk enhancement is that it compensates attorneys for bringing unsuccessful suits even though the fee statute at issue limited attorney fee awards to those cases where the attorney prevailed. The *McKinnon* court reasoned that if the risk multiplier were applied consistently then attorney's fees would be larger in the riskier cases. The court stated that "this would mean rewarding lawyers for flooding the courts with unmeritorious litigation, something we very much do not need." *McKinnon*, 750 F.2d at 1392. In addition, the court found that under a contingent-fee contract the attorney is already being compensated for risk of loss.

However, in *Ohio–Sealy Mattress Mfg. Co. v. Sealy Inc.*, 776 F.2d 646, 661 (7th Cir.1985), (an antitrust case) the court stated, "We do not mean to imply that a multiplier for the contingent nature of success is inappropriate when lawyers bear the risk of nonpayment and the delay in payment."

After *Delaware Valley (I)* was decided but prior to the decision in *Delaware Valley (II)*, the Seventh Circuit reiterated that this Circuit does not accept risk of loss as a basis to adjust the lodestar figure upward. *Hagge v. Bauer*, 827 F.2d 101 (7th Cir. 1987).

In *Shakman v. Democratic Organization of Cook County*, 677 F.Supp. 933 (N.D.Ill.1987) (Bua, J.) [Post *Delaware Valley (II)*], the district court determined that the case was one of those extraordinary cases that merited an upward adjustment for the successful results obtained: "[I]n the twenty-four years during which I have served as a judge, I have never presided over a case with greater significance or more wide felt impact in the area of civil rights than *Shakman*." *Shakman*, 677 F.Supp. at 944. However, the court found that upward adjustment for risk of nonpayment was improper. Applying the standard of the plurality in *Delaware Valley (II)*, the court found that plaintiffs' counsel would have accepted the case without any promise of a risk enhancement.

The plaintiffs in *Shakman* also sought an upward adjustment to the lodestar because of the undesirable nature of the case which caused the alienation of potential clients who would have otherwise hired plaintiffs' attorneys. Assuming that this factor remained viable after the *Delaware Valley* decisions, the court found that no specific evidence of harm to the attorneys' practice had been presented. Therefore upward adjustment was found not to be proper.

The D.C. Circuit reversed a grant of a 50% bonus for exceptional success and a 10% risk of loss bonus in *Save Our Cumberland Mountains, Inc. v. Hodel*, 826 F.2d 43 (D.C.Cir.1987) (Bork, J.) *vacated in*

**846**

*part en banc* 857 F.2d 1516 (1988). The district court had awarded the success bonus on the ground that a grant of rehearing en banc in the face of a unanimous panel opinion was exceptional. However, citing *Delaware Valley (I),* the circuit court found that the Supreme Court requires more than a finding that counsel obtained an exceptional result. It must also be shown that the quality of representation was not fully reflected in the reasonable hours and the reasonable hourly rate used in reaching the lodestar. The circuit court found that neither of the two requirements stated above had been met. First, receiving a rehearing en banc does not in itself demonstrate exceptional skill by the attorney. Secondly, the district court offered no explanation as to why the attorneys were not adequately compensated by the lodestar figure.

Relying on *Delaware Valley (II),* the circuit court also found that the award of a 10% risk-enhancement was improper. Under *Delaware Valley (II),* the Court stated that risk-enhancement can only be granted based upon an assessment of the market treatment of contingency cases as a class and not on an assessment of any particular case's degree of risk. The risks of a particular case including its novelty and difficulty were stated to be fully reflected in the lodestar. The district court in *Save Our Cumberland Mountains* had based the risk-enhancement on the difficulty for plaintiffs of the venue issue. The circuit court, however, held that this difficulty and risk was unique to the case and therefore risk-enhancement was not proper.

### 3. *Fee Enhancement Standards Generally Applicable in Bankruptcy*

In the case of *In re Summit Communities of Florida, Inc.,* 84 B.R. 863 (Bankr.S.D.Fla.1988), the bankruptcy court held, without any discussion of *Delaware Valley* and related precedent, that this case was one of those "rare" cases where exceptional performance and results deserved exceptional compensation. As a direct result of the applicants' superior performance it was found that an extra five million dollars was

brought into the estate for distribution to the creditors. Also, the counsel involved was able to elicit skillfully the cooperation of dozens of named defendants and thus was able to keep legal costs and fees at a minimum. The court held that value of efforts of the applicants was not wholly reflected in the number of hours expanded nor in the hourly rate. After noting that the risk of nonpayment was a factor that may justify an increase in attorney fees in that circuit, the court found that bonus was merited by the substantial risk along with superior quality of services and the highly successful nature of the proceeding. The court awarded a bonus of $75,000 which was equal to less than one third of the total hourly compensation (lodestar) allowed, and represented less than .05% of the total sums to be distributed to creditors.

In the case of *In re Manoa Finance Co.,* 853 F.2d 687, 18 B.C.D. 295 (9th Cir.1988), the Ninth Circuit compared the standard for awarding attorney fees in bankruptcy cases to awards under fee-shifting statutes. The court first noted that § 330 of the Bankruptcy Reform Act of 1978, 11 U.S.C. § 330, is similar to fee-shifting statutes in the respect that it is intended to attract competent counsel by awarding reasonable compensation for services rendered. However, the court also found that there are notable differences between § 330 and typical fee-shifting statutes. Under § 330, Congress expressed its intent that compensation be commensurate with that earned in comparable non-bankruptcy cases. In contrast, fee-shifting statutes are not usually intended to provide fees commensurate with other areas of law practice. Also, § 330 does not require that a party prevail in order to be awarded some attorney fees. Thus, the risk of total nonpayment in bankruptcy only arises in the event that estate funds are insufficient to pay sufficiently for services rendered. Despite those differences, the court concluded that § 330 and fee-shifting statutes are sufficiently similar to justify applying the same general principles to analyze requests for fee enhancement. However, the court cautioned that the general principles may require some accommodation especially

where enhancements relate to the risk of nonpayment.

The court found that the following factors are generally subsumed in the lodestar and can support an upward adjustment only where it is shown by specific evidence that they were not fully reflected in the lodestar:

(a) The novelty and complexity of the issues;

(b) The special skill and experience of counsel;

(c) The quality of representation; and

(d) The results obtained.

Notwithstanding these limitations the court also found that there may be cases where an enhancement is necessary to make the amount of compensation reasonable and commensurate with the rate for comparable non-bankruptcy service as required by § 330.

Therefore, the *Manoa Finance* court concluded that to justify a bonus, bankruptcy counsel must show with specific evidence why results obtained were not reflected in either his standard hourly rate or the number of hours allowed. Such counsel must also show that the bonus is necessary to make the award commensurate with compensation for comparable non-bankruptcy services.

### 4. *Attorneys Fees in "Common Fund" Cases.*

Many of the factors presently used to award fees under fee-shifting statutes were first developed in class action cases. *See Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974). However, the standard for awarding fees in class action "common fund" cases is clearly different from that used in granting an enhancement under a fee-shifting statute. *Skelton v. General Motors Corp.*, 860 F.2d 250, *reh'g denied*, 1989 U.S.App.Lexis 648, and 1989 U.S.App.Lexis 2110 (7th Cir.1989).

The issue presented in *Skelton* was whether the principles governing attorneys' fees under fee shifting statutes as between a plaintiff and a defendant are equally applicable to the division of a common fund recovery between a plaintiff class and its attorneys. *Skelton* found that the standards are different, viewing a class action under the common fund approach.

#### (a) Computation by Percentage or Lodestar Method

There are two prevailing methods for awarding fees in class actions under the common fund approach—the percentage and the "lodestar" methods. Under the percentage method, a percentage of the entire recovery is awarded. Under the lodestar approach, the lodestar plus some multiplier of the lodestar is awarded. In *Blum v. Stenson*, 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 1549–50 n. 16, 79 L.Ed.2d 891 (1984), the Supreme Court confirmed the propriety (but not any necessity) of using the percentage method in class actions involving the creation of a common fund.

Although other circuits employ the percentage approach in awarding fees from a common fund, the Seventh Circuit favors the lodestar approach. *Skelton*, 860 F.2d at 253.

The Seventh Circuit's use of the lodestar followed the approach of our district court and prevalent authority. In the case of *In re Folding Carton Antitrust Litigation*, 84 F.R.D. 245 (N.D.Ill.1979) (Robson & Will, Senior District Judges) the court adopted the report and recommendations of the Folding Carton Fee Committee. The Committee's report included an in-depth history of class action attorney fee awards in which the shift away from percentage awards was shown. *Folding Carton*, 84 F.R.D. at 255–63. The Committee then recommended that the attorneys be granted a fee award based on an hourly rate with adjustments thereto (the lodestar approach). In light of the adoption of the Committee's report, the court upheld the grant of class action fees based on the lodestar.

In *Will v. United States*, 90 F.R.D. 336 (N.D.Ill.1981) (Roszkowski, J.), the district court again found that a fee based on the hours worked was the proper method of awarding class action fees:

[D]espite the fact that there are various approaches adopted in the different Circuits for determining fees, a clear trend has emerged toward the use of a "time-rate" analysis and away from the use of a percentage of the benefit analysis.

*Will,* 90 F.R.D. at 338.

Furthermore, in bankruptcy generally, the lodestar approach—coupled with many other considerations—is the proper approach. *In re Wildman,* 72 B.R. 700 (Bankr.N.D.Ill.1987) and cases cited.

In light of the foregoing authority, the historic use of the lodestar approach in bankruptcy for all professionals, and the fact that all common fund claimants herein seek fees based on the hours worked, this Court will allow fees for common fund claimants equal to the allowed lodestar subject to adjustments by multiplier if and to the extent warranted under appropriate standards.

### (b) Principles Governing Common Fund Approach

Apart from applying the lodestar approach, *Skelton* held that principles governing fee enhancement under a fee-shifting statute are different from those governing the enhancement under a common fund recovery. The common fund doctrine was found to be based on the equitable principle that those who benefit from litigation should share its costs. In contrast, statutory fee-shifting was found to reflect the Congressional aim of encouraging private enforcement of statutory substantive rights through the judicial process. In common fund cases, the attorneys themselves petition for compensation from the fund created once they secure a settlement for the class. Therefore, the court becomes a fiduciary for the fund's beneficiaries and must monitor the disbursement to the attorneys by scrutinizing the fee applications. However, in statutory fee cases the parties seek reimbursement and the attorneys continue to act on behalf of their client. *Skelton,* 860 F.2d 252-53.

In deciding whether an attorney should be compensated for the risks incurred, *Skelton* found the difference between fee-shifting and common fund arrangements to be quite significant. The following concerns when contemplating enhancement in fee-shifting cases were found not to apply when considering a multiplier in common fund cases:

(a) The concern that granting risk multipliers to prevailing plaintiffs may inequitably burden defendants. For example, such multipliers tend to penalize the defendants with the strongest defenses since the case was very risky from the plaintiff's point of view.

(b) The concern that granting risk multipliers against losing defendants in effect requires these defendants to "subsidize" plaintiffs' lawyers for their unsuccessful lawsuits against other defendants. That is not a concern in a common fund case because the fee is charged against the plaintiff class; therefore, the defendant's liability is limited to the amount of the common fund awarded or recovered by settlement.

*Skelton,* 860 F.2d 253-54.

*Skelton* noted the stringent requirements for awarding risk multipliers in light of the Supreme Court's decision in *Delaware Valley (II),* 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987). However, in a common fund case, *Skelton* found that a court has more latitude in exercising its equitable powers because there is no immediate or direct danger of an undue burden on defendants. 860 F.2d at 254.

Furthermore, *Skelton* found that even if a case began under a fee-shifting statute and was settled by the creation of a common fund, common fund principles would apply in awarding fees. *Skelton,* 860 F.2d at 254-55.

According to the Seventh Circuit, in *Skelton,* to determine whether a risk multiplier should be allowed in a common fund case, the trial court should begin with the lodestar and then adjust to "reflect the 'contingent nature of the attorney's undertaking.'" The adjustment is made by assessing the likelihood of success in obtaining a judgment or settlement as of the time the attorney began work on the case:

[W]hen attorneys' receipt of payment is contingent on the success of the litigation, reasonable compensation may demand more than the hourly rate multiplied by the hours worked, for that is exactly what the attorneys would have earned from clients who agreed to pay for services regardless of success. Thus, to account for the contingent nature of the compensation, a court should assess the riskiness of litigation.

*Skelton,* 860 F.2d at 258.

*Skelton* did not pass on whether the lodestar should be adjusted to account for the delay in payment or the quality of representation. However, the court did state that "a multiplier may not be the best method for compensating attorneys for the superior quality of their work." Rather, the court felt that counsel could be compensated for superior quality in the lodestar through high hourly rates. *Skelton,* 860 F.2d at 255 n. 5.

Whether the rationale of *Skelton* applies in a bankruptcy case where as here special class action litigators recover a "common fund" for benefit of creditors is not clear. Indeed, some of the reasoning for awarding fees from a common fund does not apply when that fund is recovered in a bankruptcy case. The equitable rationale that those who benefit from litigation should share its costs is not always fully appropriate in a bankruptcy case. In bankruptcy, whether attorneys fees are recovered from property of the estate or from a "common fund" through class action, all creditors of the debtor share the burden of paying for all services rendered, both for the class action and for other necessary work. Furthermore, the attorney in bankruptcy often does not face the same type of contingency risk as the usual class action litigation. While in a class action the attorney usually recovers only if successful, in bankruptcy the attorney will generally recover some fees from the estate if funds are available from any source even if a particular effort is not successful, though the amount of fee recovery will of course be affected by degree of success of each task performed and by the total of available assets.

#### (c) Work to Prepare Fee Petitions in Common Fund Cases

In *Mills v. Eltra Corp.,* 663 F.2d 760 (7th Cir.1981), the court found that attorney's fees are not awarded for time and effort spent in complying with court-created requirements that counsel must meet in order to collect a fee to which he is legally entitled where the right to compensation depends upon the creation of a common fund or benefit rather than statutory entitlement. *Mills* 663 F.2d at 761.

The court in *In re Nucorp Energy, Inc.,* 764 F.2d 655 (9th Cir.1985), was faced with the question of whether attorneys seeking fees under Bankruptcy Code § 330 are entitled to compensation for services related to preparation and presentation of its fee application. That court found that bankruptcy counsel is usually entitled to compensation under § 330 for such work. However, the court also recognized that under the common fund theory compensation is not given for time spent in fee litigation:

Courts have denied compensation for time spent litigating the propriety of the fee award in common fund cases on the theory that the class is not benefited thereby. Courts have also said that because the attorneys' compensation is derived from the fund itself, the attorneys' interests in litigation over the amount of the fee are in direct conflict with those of the class members. In short, time expended in an effort to obtain an attorneys' fee award in such cases has been held to be non-compensable on the theory that the attorney's efforts do not benefit the class but rather serve to deplete the fund and hence reduce each class member's ultimate recovery. (citations omitted)

*Nucorp,* 764 F.2d at 661.

That reasoning is most persuasive, and the rule in *Mills* controls in this Circuit. Accordingly, where class action counsel for a debtor are treated under common fund principles, they cannot obtain compensation for preparing their fee applications as can the usual bankruptcy counsel (who must, however, meet more difficult standards in

seeking enhancement over lodestar). That is particularly relevant here because some counsel have improperly sought the best of both worlds. Indeed, all class counsel in this case claim multipliers on lodestars that include work to prepare their fee applications. Thus, they not only seek compensation for preparation of their fee applications, but also seek a multiplier on such work.

### 5. *Other Standards and Requirements*

Regardless of what fee standard applies, the general standards for format and information required in bankruptcy fee applications, and necessity for the bankruptcy judge to rely in part on experience, all remain applicable. *See In re Wildman,* 72 B.R. 700 (Bankr.N.D.Ill.1987), and cases cited therein.

### C. THE SWIDLER & BERLIN APPLICATION

#### 1. *History of Applicant*

Swidler & Berlin is a firm of very experienced counsel officed in Washington, D.C. Prior to the filing of Debtor's bankruptcy petition, the Debtor retained Mr. Ferguson of Swidler & Berlin to research certain securities matters relating to Churchfield's program of first and second mortgages. The purpose of the research was to determine whether Churchfield had a cause of action in connection with the Illinois Secretary of State's investigation into those mortgages.

On August 31, 1984, Bankruptcy Judge Eisen approved an order employing John R. Ferguson and the law firm of Swidler, Berlin & Strelow (presently Swidler & Berlin) as special counsel for the Debtor for the following reasons:

It further appearing to the Court that the purpose of Mr. Ferguson's research was to determine whether Churchfield had a cause of action in connection with the Illinois Secretary of State's investigation into Churchfield's program of first and second mortgages;

. . . . .

It further appearing to the Court that the applicant debtor in possession desires to retain John R. Ferguson and the law firm of Swidler, Berlin & Strelow to continue its representation of the debtor because of its unique familiarity with the facts and issues of the matter and because they are highly qualified to prosecute any civil action arising out of their investigation. . . .

Judge Eisen determined that the services rendered by Mr. Ferguson and the firm of Swidler, Berlin & Strelow could result in a recovery of a substantial sum and therefore substantially benefit the estate and Churchfield's creditors. However, the retention was not contingent on success.

Judge Eisen's order stated that the terms of retention of Mr. Ferguson and the law firm of Swidler, Berlin & Strelow for work performed for Churchfield was a rate of $180.00 per hour for Mr. Ferguson and $100.00 per hour for associates at his firm. That order has not since been amended, nor did applicant ever request that it be amended. About four months after Judge Eisen's order, on December 24, 1984, Swidler & Berlin filed an action in the district court on behalf of Debtor and also on behalf of a class of Churchfield investors who comprise most but not all creditors of this bankruptcy estate.

On November 26, 1985, District Judge Plunkett granted Swidler & Berlin's (S & B) motion for class certification. S & B has performed services for the certified class of approximately 1,400 Churchfield investors and the Churchfield estate in the Class Action entitled *Churchfield Management & Investment Corp., et al. v. Winston & Strawn, et al.,* Case No. 84 C 10904 (N.D.Ill.). The Class Action resulted in a $10.52 million settlement that has been finally consummated.

#### 2. *Swidler & Berlin's Fee Request*

This Court has previously ruled on two of S & B's fee applications as follows:

| First Application | 06/11/84—03/31/85 |
|---|---|
| Requested | $201,432.29 |
| Provisionally Approved | 165,932.29 |
| Allowed for Payment | 142,083.67 |

| Second Application | 04/01/85—12/31/85 |
|---|---|
| Requested | $425,345.67 |
| Provisionally Approved | 369,418.64 |
| Allowed for Payment | 230,992.96 |

To date, S & B has received only $97,-475.66 of the amounts previously allowed for payment.

Notwithstanding the fact that Judge Eisen's order set S & B's attorney rates at $180 for Mr. Ferguson and $100 for associates, S & B seeks far higher current rates for all work done while employed on Debtor's behalf over the past four years. The present application includes fee requests for the period from June 11, 1984 to December 31, 1985, even though S & B previously submitted two interim fee applications reporting historic rates covering that period and this Court ruled on those applications. S & B's current request also includes fees for the period of January 1, 1986 to June 30, 1986; although S & B has submitted two fee applications covering that period, this Court has not yet ruled on those applications. Lastly, included within S & B's current request are fees for the period of July 1, 1986 to August 15, 1988; previously S & B submitted a fee application for a portion of that time, but that application has been superceded by S & B's Comprehensive Final Fee Application now under consideration.[2]

All prior fee applications by S & B were based on its asserted right to seek non-contingent payment for its work based on time worked and expenses advanced.

Although, S & B's pending Comprehensive Application requests a lodestar figure which includes all attorney and non-attorney hours for all time worked since the firm was retained pre-petition by the Debtor, calculated at current firm billing rates, the application only has daily time entries for the period from July 1, 1986 through August 15, 1988. S & B asks the Court to refer to prior applications for the daily time entries for the previous period. Furthermore, its lodestar calculation does not separate those hours which were previously ruled on from those which are sought for

the first time. This has made it very difficult for the Court to determine what amounts are included in S & B's lodestar for the various periods mentioned above. It is of course the responsibility of counsel applying for fees to demonstrate the detail sufficient to support said application. *See In re Wildman,* 72 B.R. 700, 707–08 (Bankr.N.D.Ill.1987)

S & B contends that the Court should reconsider fees and expenses previously disallowed, stating that its interim petitions were insufficient in some areas because it did not want to reveal privileged litigation strategies. S & B gives only one specific example as to why the Court should reconsider the previous disallowances:

> As an illustration of this dilemma, when the Court incorrectly concluded, based upon Winston & Strawn's mistaken assertion in its objections to Applicant's second interim petition (quoted at length in the Court's Second Order, page 9), that Applicant had devoted "over seven hours on the drafting of each page of the reply memorandum [in support of plaintiffs' motion for class certification]" Applicant elected not to respond. Winston & Strawn's objection was far from correct, but Applicant could not answer the defendants' allegation without revealing sensitive negotiations and written product, the disclosure of which might have jeopardized the interests of the Class. Applicant's references to its work on the class action briefing in its time sheets were deliberately left vague to avoid revealing that Applicant had substantially prepared the Amici Brief in support of class certification which the two Creditors' Committee counsel, Mr. Pelliccioni and Mr. Felton then filed with the District Court on May 31, 1985. That separate brief was largely drafted by Litigation Counsel and was the product of lengthy negotiations during which we also reviewed the evidence supporting

---

2. S & B previously submitted a Fourth Interim fee application covering July 1, 1986 through September 30, 1986. That application did not contain daily time entries for the fees requested. This Fourth Application has been superceded by S & B's Comprehensive Fee Application, which does include daily time entries for the above period. Therefore, this Court will not further consider S & B's Fourth Application. However, this Court will still consider any objections that were previously filed to the Fourth Application and not withdrawn.

plaintiffs' claims. Thus, Applicant's necessarily cryptic descriptions of its efforts on the reply brief and class action briefing referred not only to Applicant's own reply brief but also covered the several days of negotiations and preparation of the Amici brief. Applicant undertook this substantial effort because it recognized that without class certification the claims of the investors would be mere derivative damages claims asserted through the Churchfield estate and, thus, would be subject to the defenses that the defendants had asserted against the Churchfield claim.

S & B Comprehensive Application, at 7, n. 4. S & B does not explain why it made no offer at the time of an *in camera* filing to justify the earlier disallowed requests, and does not now specify what showings, other than the one example above, it could have made then. Nor does it now demonstrate particular hours worked on the single project referred to. Considering the relatively uncomplicated nature of the Amici Brief referred to, and the reasons of this Court for the earlier ruling, the original allowance and denial in part will not be disturbed.

S & B now seeks a lodestar amount equal to $1,555,039.50 (for all time worked —including that previously disallowed—at current firm billing rates) plus expenses totalling $196,478.83 (which apparently includes all expenses previously requested— including amounts previously disallowed— plus word processing costs which were not requested in prior applications). Under the common fund theory, S & B also asks this Court to grant it a multiplier of 2.0 on its lodestar amount. Thus S & B requests:

| | |
|---|---|
| Lodestar Fees | $1,555,039.50 |
| Times 2.0 Multiplier | × 2.0 |
| | $3,110,079.00 |
| Plus Expenses | $ 196,478.83 |
| Net Requested | $3,306,557.83 |
| Less Payments Received pursuant to prior fee awards | ($ 97,475.66) |
| Net Requested | $3,209,082.17 |

### 3. *Application of Common Fund Principles and Historic Lodestar Rate to be Used by this Court*

This Court must first decide whether Judge Eisen's retention order, setting S & B's rate at $180.00 per hour for John R. Ferguson and $100.00 per hour for associates at his firm, is applicable to all of the hours worked by S & B.

S & B stated the following in its "Memorandum in Reply to Objections to Comprehensive Fee Application":

Arguments based on the original retention order not only mock reality, but would lead to an unjust result. While the U.S. Trustee is correct that we were retained by the bankruptcy estate in 1984 on a pay-as-you-go basis in this high-risk litigation, early on it became clear that the bankruptcy estate would not be able to fund the Class Action litigation. We did not stint on that account or ask to withdraw. Having been denied the benefit of the bargain struck prior to the commencement of our undertaking and having accepted the reality of contingent compensation, fundamental fairness mandates that we be compensated on the contingency basis on which we actually worked for four years.

Further, the retention order in no way precludes our petition for compensation as Class Counsel under the standards applicable to securities and other common fund class actions. And, of course, Judge Plunkett's Order places the issue of our compensation as "Class Counsel" squarely before this Court for resolution.

S & B's Reply to Objections, at pp. 7–8.

S & B's argument that its retention order was automatically turned into a contingency retention is without merit. If a non-contingent arrangement is made between an attorney and his client or is approved by the Bankruptcy Court as it was here, that arrangement does not magically turn into a contingency arrangement as soon as the attorney feels the client may have difficulty paying. An explicit new arrangement would be necessary to transform the relationship into one that is contingent. Moreover, here there were substantial assets in

the estate that resulted in $2,332,000 on hand at the end of the case. Indeed, during pendency of the bankruptcy case the largest of those assets ("Crestwood Village") was projected by most of the parties in interest at a value much larger than was ultimately realized. In addition, these counsel repeatedly sought interim fees based on their claim for noncontingent payment of their lodestar. At no time until their final application did they make a claim based on their current theory. Accordingly, the argument that they were "denied the benefit of the bargain" at some undefined point is disingenuous.

Alternatively, S & B contends that the retention order by its term in no way now precludes the award of fees under common fund rules. It further suggests that its representation of the class was distinct from the representation of the bankruptcy estate in litigation. S & B summarily argues that the common fund doctrine applies in this case. It does not discuss the purposes of common fund fee recovery, and how those purposes relate to a bankruptcy case.

(a) Use of Common Fund Standards

▇ Analysis of this unusual situation must surely begin with the Bankruptcy Code which requires award of fees under the same standards as enjoyed by attorneys outside of bankruptcy:

(a) ... the court may award to a trustee, to an examiner, to a professional person employed under section 327 of 1103 of this title, or to the debtor's attorney—(1) reasonable compensation for actual, necessary services rendered by such trustee, examiner, professional person, or attorney, as the case may be, and by any paraprofessional persons employed by such trustee, professional person, or attorney, as the case may be, based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; ...

11 U.S.C. § 330. In light of § 330, class action litigators who work for bankruptcy estates on a contingent basis are generally entitled to be compensated for actual and necessary services under the same "common fund" standards as are class action litigators who represent a class consisting of other than bankruptcy creditors.

(b) Applying Common Fund Principles to S & B's Work

In *Boeing Co. v. Van Gemert*, 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980), the Supreme Court defined when attorneys may receive their fee from a common fund. The Court noted that it has consistently recognized that a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole. The Court stated that the doctrine,

.... rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense. Jurisdiction over the fund involved in the litigation allows a court to prevent this inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit. (citations omitted.)

*Boeing*, 444 U.S. at 478, 100 S.Ct. at 749.

*Mills v. Electric Auto–Lite*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1969), stated the following in allowing attorneys' fees from a class fund created by the litigators: "To allow the others to obtain full benefit from the plaintiff's efforts without contributing equally to the litigation expenses would be to enrich the others unjustly at the plaintiff's expense." *Mills*, 396 U.S. at 392, 90 S.Ct. at 625.

In this case, the Churchfield Estate as well as the class of Churchfield creditors all benefitted from the work of S & B. All those persons who stood to benefit from the Class Action were creditors of the Estate. Therefore, any fees that the Estate pays to S & B will decrease the amount to be distributed to creditors. All those creditors who benefit from the Class Action will share in its cost however computed (although they may not share in the same

proportion or amount if common fund fees are allowed). Thus, the rationale for allowing fees from the common fund does not fully apply to debtor's special litigation attorneys when the debtor's creditors include all those in the class who will benefit from the class action recovery. However, that should not and does not in the light of § 330 negate the application of common fund fee principles to class litigators.

### (c) Use of Historic Rates to Compute Lodestar

It is correct that Judge Eisen's order did not by its terms preclude the award of fees under common fund rules. Therefore, this Court will begin with a lodestar figure determined at proper rates, and then determine what multiplier is appropriate under common fund standards in the context of this proceeding and the history set forth above.

It must be said that S & B had a duty to come before the Court to seek modification of its retention order as its historic firm billing rates increased over the years. Had S & B come forward earlier and sought to raise its rate to match changes in those historic rates, this Court would upon such request likely have allowed adjustments to historic rates to apply to future work. Finding that the order fixing hourly rates still applies to S & B, this Court may nonetheless exercise its equitable power to recognize increased rates where application today of the original rates allowed is found to be unjust. That is the case here where the original hourly rates do not fully compensate for the quality of work performed, complexity of issues, and experience of counsel.

No other attorneys in this case are working under a retention order which set a maximum for their rates, as Judge Eisen's order did for S & B. All other attorneys seek either their current or historic rates. It would be totally unjust for all other attorneys to receive current or historic rates, and hold S & B to the original court-ordered rates which are often far below both its current and historic rates. This Court will therefore exercise its equitable authority and discretion to allow S & B rates at its historic rate levels, and will not limit counsel to the rates fixed in Judge Eisen's order despite their failure to ask for its modification.

However, S & B now asks that it be allowed all time worked during the entire case at its now current billing rates. That request will not be allowed for a number of reasons. First, to do so would be to ignore Judge Eisen's order under which they were to be employed at fixed hour rates. While Judge Eisen's order did not preclude the award of fees under common fund rules, it indicated use of historic rates to compute the lodestar for this firm. Second, allowance of current rates for all work over the 4½ year period would allow S & B to receive current rates for work done years ago at the time of and shortly following the order employing them. To allow increase over the rates S & B agreed to work for during that period would make a mockery of the order approving its retention. That would also be a great injustice to the other fee claimants who have heretofore been allowed their historic time rates for that time period. Third, and most significant, S & B's claim for fees against the estate was non-contingent and subject to only limited risk. The estate at all times had substantial assets from non-litigation sources. Even had the litigation failed, S & B would have been paid something for the work of its attorneys, albeit a reduced amount to reflect lack of success and the limited assets available (about $2.3 million for S & B and all other professionals, and creditors). Finally, its interim fee applications, heretofore passed on, were based on historic rather than current rates, and resulted in allowance and partial payment based on those historic rates.

Therefore, this Court will determine what multiplier is appropriate under common fund standards in the context of these proceedings, and then compute the lodestar at S & B's historic rates.

### (d) Application of Multiplier

S & B correctly asserts that in common fund cases the lodestar amount is only the starting point which should be adjusted upwards by a multiplier. It contends that the requested 2.0 multiplier is well below

the 3.0 to 4.0 multiplier typically awarded in securities and other class actions. It suggests that the following factors are to be considered in determining the appropriate multiplier: (i) benefits obtained; (ii) novelty and difficulty of the factual and legal questions presented; (iii) skill, efficiency, and experience of the attorneys who were committed to the effort; (iv) delay in payment; and (v) risks of contingent payment assumed by counsel.

### (i) Benefits/Results Obtained

The benefits obtained are indeed significant. S & B succeeded in obtaining the district court's certification of a broad class which includes all Churchfield investors (both Money Market Mortgage purchasers and limited partners). In the end, S & B helped establish the defendants' accountability with respect to numerous offerings of Money Market Mortgage notes involving thirteen separate properties and eight separate limited partnership offerings, spanning a period from 1981 through 1984.

### (ii) Novelty and Difficulty of Issues

The issues in litigation were often both novel and difficult. The Class Action raised a number of issues about obligations and responsibilities of law firms as to which there are no clear answers, including the following: Does a law firm's fiduciary duty to its client run to the client's public investors? Does the law firm's failure to exercise "due diligence" satisfy the scienter standard under the federal securities laws such as SEC Rule 10b–5? Do securities purchasers have a right to sue under a malpractice theory against a law firm that serves as securities counsel to its client, despite the lack of privity?

### (iii) Skill, Efficiency, and Experience of Attorneys

There is no question that the attorneys at S & B are skilled. Mr. Ferguson gradu-ated first in his class at Case Western Reserve University in 1963. He has been in the practice of law for twenty-five years. He was appointed by the Attorney General of Ohio as special securities and litigation counsel to the State of Ohio in securities fraud proceedings involving *Equity Funding, King Resources,* and *Four Seasons.* He also was appointed as one of the Special Masters team in the *National Student Marketing* securities fraud litigation.

John Umana, the partner who handled most of the litigation work, specializes in securities litigation. He received a Ph.D. from the University of Michigan Rackham Graduate School in 1975, and his J.D., *magna cum laude,* from the University of Michigan Law School in 1977. Mr. Umana appears to have substantial experience in securities/commodities and class action litigation.

### (iv) Delay in Payment

In its petition S & B contends that it has paid out nearly $200,000 in out-of-pocket expenses. Further, S & B contends that the bulk of its "investment" in the litigation—both in work performed for fees and expenses disbursed—were incurred in the first two years of the Class Action.

Judge Eisen authorized appointment of S & B as special counsel on August 31, 1984. Prior to that authorization, S & B had received a $25,000.00 retainer. Since appointment, S & B has received $72,475.66, for a total of $97,475.66 received. Prior to December 31, 1985, S & B had incurred court approved expenses of $30,294.50 and the Court tentatively approved fees totalling $505,056.43 against which the $97,-475.66 in payments applied. Following that date, S & B requests $108,232.17 in expenses[3] and a lodestar amount of approximately $770,180.50 based upon historic

---

3. In addition to expenses during the period after December 1, 1985, S & B asks for word processor computer costs incurred between June 1984 and June 1986 which were not requested in the applications covering those periods. This amount equals $29,660.00. As discussed under specific disallowances ((5)(d)(viii) at p. 864, *In-fra* ) this expense is wholly disallowed because it amounts to an overhead expense, or at least they have failed to show that it is something other than an overhead secretarial-type in-house overhead cost normally included by lawyers in the fixing of hourly billing rates.

rates (shown in the Application along with current rates for the same work). In light of these figures it cannot be said that the bulk of S & B's investment in time and disbursements was incurred in the first two years, though it is correct that S & B has faced delay up to four years in receiving a substantial portion (about one-third) of its requested but unpaid lodestar and expenses.

### (v) *Risks Assumed by Counsel*

As discussed hereinabove, under the common fund theory the court is to adjust the lodestar to "reflect the 'contingent nature of the attorney's undertaking.'" *Skelton,* 860 F.2d at 255.

S & B was employed with Court approval on a noncontingent basis. Had the Class Action been unsuccessful, S & B would certainly have recovered at least a portion of its fees and expenses from the $2.3 million in Estate moneys presently available for distribution from sale of estate property. Trustee's July 28, 1988, Application For Interim Compensation, at p. 4. Indeed, S & B has already received $97,-475.66 in payments from the Estate. However, as previously noted, allowance of fees from the limited estate assets would have been less had results of the Class Action been negative.

### (vi) *Conclusions as to Multiplier*

The common fund standards to be considered by this Court in fixing a multiplier as discussed hereinabove, are adequately reflected in the lodestar amount at historic firm billing rates, except for the partial risk of reduced payment. The *Skelton* court agreed that a multiplier may not be the best method for compensating attorneys for the superior quality of their work since that may be reflected in the lodestar. *Skelton* also found delay in payment to be properly compensated by using current rates, or by using historical rates plus a prime rate enhancement. *Skelton,* 860 F.2d at 255 n. 5. Although it has been found here to be improper to award current firm rates in light of Judge Eisen's order and the non-contingent retention of coun-

sel, the S & B lodestar computed at its historic rate is clearly high enough to take into account the quality of work, results obtained, complexity of issues, skill of counsel, and the time delay in payment S & B has faced for one-third of its work. Furthermore, S & B forced the rate uncertainty upon itself by failing to seek an amendment to its retention order, and it must now face some consequences of that failure. The ordered terms of retention in bankruptcy must be given weight.

S & B argues that contingent fee litigation involves substantial risks. While that is true, it is not true as it also argues that if the Class Action had failed it would have recovered nothing for its four years of services. S & B would clearly have been entitled to a partial recovery of fees and expenses even if the Class Action were unsuccessful. S & B was not hired as contingent fee counsel and would have been entitled to some recovery. It cannot come aboard as non-contingent counsel at the take off and then claim at the landing to have been class counsel at full risk all along.

In *Skelton,* 860 F.2d 258, the court found that a doubling of the lodestar would provide a proper ceiling in a case where recovery by counsel was wholly contingent. Since this Court has determined that S & B's degree of risk was substantially below that faced by wholly contingent class counsel in the usual case, a multiplier of only 1.5 is proper in this case.

In light of the ceiling recommended in *Skelton* for risk multipliers, the fact that S & B's degree of contingency risk was substantially below that usually faced by class counsel, and for other reasons set forth hereinabove, this Court finds that a multiplier of only 1.5 times historic lodestar rates is appropriate in this case.

### 4. *Swidler & Berlin's Third Fee Application*

#### (a) Amount of Fees and Expenses Sought

This Court will consider separately the fees and expenses sought in S & B's Third

Application and those sought for the first time in its Comprehensive Application.

The Third Application covers the period from January 1, 1986 through June 30, 1986. S & B therein seeks $191,491.25 in fees and $21,996.98 in expenses.

### (b) Specific Requests for Fees

#### (i) *Law Clerks and Paralegals*

This Court's prior two interim compensation orders, entered in 1986, allowed $45.00 per hour for law clerks and paralegals, for reasons then set forth by the Court. No affidavit or showing was tendered by S & B showing that salaries paid those persons or other factors warrant a higher rate under the Court's prior reasoning which approved a rate to give the firm a normal profit margin equal to 100% of salaries paid. (See analysis as to law clerk rates hereinbelow in Section No. 5, at pp. 51–53.) Therefore, this Court will continue to allow the $45.00 rate for the period of the Third Application.

S & B also used "staff economists" on the case for which they charged $65 per hour. S & O has not provided information about the salary, education, or background of these economists. In the absence of such information, the Court assumes that the economists' education is similar to that of a paralegal, since S & B has stated that all paralegals have received a BA or higher degree. Therefore, this Court will allow fees for the staff economists at the same rate that is allowed for paralegals. Higher rates sought for work of paralegals and economists will be disallowed hereinbelow.

#### (ii) *Trial Preparation and Discovery*

S & B spent approximately 384.75 hours of attorney time and 688.75 hours of non-attorney professional time on the many complex problems related to trial preparation and discovery. Its work largely included deposing Winston & Strawn witnesses and analyzing the long depositions in the light of information contained in voluminous documents.

Several parties have objected to the hours spent, and requested that S & B provide a detailed explanation of its servic-es under this category. The Trustee made the following objection when this application was filed:

> Swidler & Berlin spent significant amounts of time on trial preparation and discovery in connection with the Winston & Strawn Litigation. Approximately 180 hours were spent on what was described as "assistance at depositions", while over 200 hours were spent on activity described as "deposition preparation". Discussions with counsel at Swidler & Berlin have revealed that these brief descriptions were used to avoid revealing litigation strategy. Accordingly, the Trustee recommends that a full and complete description of services be filed *in camera* with the Court and the Trustee and that an abbreviated description of services be filed with the Court records. This will serve the dual function of preserving the secrecy of litigation plans while also allowing the Court to determine the benefit to the estate of the services described.

Trustees Objections to Third Applications, at p. 5.

Winston & Strawn earlier argued that the hours charged by S & B for trial preparation and discovery:

> .... [R]eflects a chronic pattern of overlawyering totally unrelated to the interests of the estate. Indeed, after review of three of the transcripts of depositions taken by plaintiffs' counsel, Magistrate Thomas Rosemond found in May of 1986 that "the depositions to date of Winston & Strawn attorneys have been excessively long in duration compared to the respective attorneys' involvement in the case...." .... Magistrate Rosemond concluded further:

> Much of the questioning by plaintiffs' counsel during the depositions of Messrs. Denvir, Murphy and Waite [Winston & Strawn attorneys] was irrelevant and appeared wasteful of the time of the deponents and other counsel in attendance. At times, the questioning was repetitous [sic] and argumentative.

Objection of Winston & Strawn to Application of Swidler & Berlin, at pp. 2–3.

858

Winston & Strawn went on to argue that even after Magistrate Rosemond's Report and Recommendation, the depositions continued to drag on. Also, Winston & Strawn argued that S & B seeks compensation for court appearances and briefing which did not benefit the estate since each of these disputes has been resolved in a manner contrary to the position asserted by plaintiffs before the district court. Examples given of the above briefing and appearances include:

Plaintiffs' motion for a discovery conference and for sanctions, brought in March of 1986, was denied by Magistrate Rosemond and Judge Plunkett.

Plaintiffs' motion for discovery cutoff, brought in September of 1986, was denied by Judge Plunkett.

Magistrate Rosemond recommended that Winston & Strawn's motion for protective order, brought in April of 1986 in response to plaintiffs' abusive discovery tactics, be granted. Judge Plunkett subsequently entered a modified protective order.

The Second Secured Creditors Committee made the following objection:

The amount of time spent preparing for, taking, and preparing digests of deposition, at times, appears excessive. Because the time entries supplied by Swidler & Berlin are brief, it is often impossible to tell precisely how much time was spent on a particular deposition. It appears, however, that Mr. Umana spent 8 hours on January 8 taking the deposition of Mr. Denvir and 9 hours taking the deposition of Mr. Murphy on January 9 (17 hours). These depositions were also attended by A.E. Maxwell [a paralegal] (17 hours). Preparation time prior to the depositions may total as much as 67 hours. Subsequent to the depositions as much as 87.5 hours may have been spent during the remainder of January reviewing, digesting, analyzing and writing memos about these depositions. These figures appear to be excessive unless justification can be offered by more detailed time records or some explanation as to the significance of these deponents testimony.

Objections of Second Secured Creditors Committee, at p. 2. S & B tendered no such explanation. However, proof of value of work reported in this application is shown to some extent by successful settlement of the Class Action, so the Court is willing to give the benefit of the doubt to this applicant as to these serious objections. However, the foregoing considerations certainly give added weight to the decision to restrict the S & B lodestar to historic rates and to limit its multiplier to 1.5.

### (iii) *Fee Petition Preparation*

■ As stated above, attorneys seeking fees from a common fund are not entitled to compensation for time spent preparing and litigating fee petitions. Therefore, the 89.00 hours of attorney time and 77.50 [4] hours of non-attorney time that S & B requests for work in preparing the instant application will not be allowed. Also, since S & B seeks to be treated under common fund standards for all its work, the time employed in preparing and litigating prior fee petitions must likewise be disallowed.

In the prior fee petitions S & B stated nothing about recovering under the common fund theory. Therefore, this Court then had no reason to believe it should disallow fee application work at that time. S & B sought $4,445.00 for such work in its Second Application.[5] In this Court's Second Interim Compensation Order a disal-

4. In its narrative, S & B state that it is requesting 83.50 hours for non-attorney work in this category. However, the time entries for non-attorneys total only 77.50 hours.

5. In this Court's Second Interim Compensation Order it was stated that 25.5 hours was devoted to preparation of the second fee petition at a mixed rate of about $140/hour or $3,570 in total. On recalculating the hours devoted to fee work, this Court finds that the correct time amount is 49 hours. However, it is also this Court's understanding that Carter, who did the majority of the work on the fee petition, is a staff economist who is being compensated by the Court at a rate of $45/hour. Upon recalculation this court finds that a total of $4,445.00 was sought by S & B as compensation for preparation and litigation of its fee petition.

lowance of $1,000.00 was made for fee preparation work, therefore another $3,445.00 will be disallowed at this time.

S & B cannot enjoy the status of bankruptcy attorneys who get paid for preparing fee petitions under normal bankruptcy standards, and also be compensated under common fund standards where no compensation is paid for such work.

### (c) Allowed Historic Lodestar

With a 36.25 hour reduction in Mr. Umana's time (36.25 × $150 = $5,437.50) and a 52.75 hour reduction in Ms. Lubin's time (52.75 × $125 = $6,593.75) for time spent on fee work on the Third Application, a lodestar at historic rates of only $133,346.25 will be allowed for attorney time. With a 77.50 hour reduction of paralegal, law clerk and staff economists time (77.50 × $45 = $3,487.50) a historic lodestar of 42,356.25 will be allowed for work of those persons.[6] Thus, a total historic lodestar of $175,702.50 will be allowed.

### (d) Expenses

S & B's Third Application sought expenses totalling $21,996.98 for the following expenses:

| | |
|---|---:|
| Air Fare | $ 7,154.00 |
| Lexis | 1,654.66 |
| Long Distance Telephone Charges | 1,575.24 |
| Postage | 117.23 |
| Business Meals/Lodging/Out of Town Transportation | 6,269.20 |
| Duplicating | 3,796.99 |
| Courier Services | 1,069.66 |
| Total | $21,996.98 |

The only itemized records that S & B provides are for air fare.

The Trustee requested further information on the trips taken to Chicago, the postage, the business meals/lodging/out of town transportation, and the duplicating expenses requested. S & B provided the Trustee with copies of hotel and meals bills which adequately accounted for nearly 99% of the $6,269.20 sought as reimbursement for out-of-town meal and lodging expenses. Therefore, the Trustee withdrew his objections to these expenses.

---

**6.** On this Court's recalculation of non-attorney time it was determined that S & B lists 1018.75

### (i) *Air Fare*

Attorney Umana and a paralegal made six trips to Chicago during the time period of this fee application. Mr. Umana also made three trips to Chicago unaccompanied. During these trips the two individuals attended a total of ten depositions in Chicago. From the breakdown found in S & B's fee application it is impossible to tell what trips were for which depositions since the dates given do not coincide with the dates of the depositions. However, it is clear that each trip was to cover one or more depositions and related preparations. Therefore, all the above mentioned air fares will be allowed.

S & B also seeks reimbursement for flights of attorneys Umana and Ferguson to Chicago, dated November 21, 1985. This flight is outside the period of this application. Therefore, the Court has had to look at the prior fee application for a justification for this trip. As found from review of S & B's Second Application, Umana attended a hearing before Judge Plunkett in which the Judge granted S & B's class certification motion. Mr. Ferguson did not list his time for such duplicative trip and appearance in the earlier application. In the absence of any other explanation or justification for two attorneys flying in to learn the ruling, one cost of flight and attendance time of counsel would ordinarily be disallowed. However, given the success of counsel that flowed in part from such extravagant staffing, such disallowance will not follow here. But in allowing these and similar items that could be questioned, it should again be emphasized that this lends greater weight to the Court's decision to limit S & B to historic rates and a multiplier of 1.5.

### (ii) *Lexis*

In determining whether Lexis expenses will be allowed, a court should examine the attorney's representation as to

hours of non-attorney time.

necessity of the research. S & B has made no such representation. However, this case involved a number of legal issues that could have been researched through Lexis to save on research expense. This Court reviewed several of the resulting briefs during the settlement conferences and learned about those issues. Therefore, the Lexis expense is allowed in full.

(iii) *Long Distance Phone Calls*

■ The Court will allow the full amount of long distance phone charges requested because S & B is located in Washington, D.C. while much of the case activity took place in Chicago and knowledgeable persons were located here.

(iv) *Postage*

■ Postage is generally considered overhead and will not be compensated in the absence of special circumstances. Postage will only be allowed when express mail or special delivery is necessary, and such specification is made by the applicant. Therefore, this Court will not allow the $117.23 postage expenses, there being no showing of other than ordinary mail usage.

(v) *Out–of–Town Transportation, Meals, and Lodging*

■ In light of the production of copies of bills for out-of-town transportation, meals, and lodging, the amounts claimed will be allowed in full.

(vi) *Photocopying*

■ In response to objections to its Comprehensive Application, S & B does affirm that its charges for in-house copying are at a rate of 15 cents a page or less. Therefore, the court will allow the full amount requested.

(vii) *Courier service*

■ Courier services are ordinary, necessary, and in this case reasonable in amount. They are allowed in full.

(viii) *Total amount allowed*

Expenses of $21,879.75 will be allowed for the period of S & B's Third Application

5. *Comprehensive Application.*

(a) Amount of Fees and Expenses Sought

S & B's pending Comprehensive Application includes a request for all hours worked by S & B since it was retained and all expenses incurred by the firm since its retention. Nowhere within the Comprehensive Application does S & B set out separately what additional fees and expenses it is requesting for the first time in the Comprehensive Application. This has made the Court's job very difficult. S & B does list separately the hours worked from July 1, 1986 through August 15, 1988. The application also includes a computation of the historic lodestar (since retention) broken down as to each attorney. Using the latter two sources of information, the Court was required to compute for itself the historic lodestar for the period beginning July 1, 1986 and ending August 15, 1988.

(b) Specific Disallowances of Fees

(i) *Law Clerks*

■ Law clerks are reported as historically being billed at a rate ranging from $55.00 to $65.00 an hour. In the two prior interim compensation orders entered as to S & B herein, it was found that a rate of $45.00 was sufficient to allow the firm to gain a net profit in the range of what is customary and necessary. Because salaries of S & B law clerks have risen following those earlier orders (as the profession generally has achieved new heights of overhead), this rate will now be allowed at $60.00 per hour. At an hourly rate of $60.00 and an average of law clerk salaries reported by S & B amounting to a per annum rate of $41,000, S & B will receive net annual profit equal to each law clerks salary, assuming 2,000 billable hours worked per year, less a 15% reduction for noncollection and allowance for overhead that experience shows to be common:[7]

7. The average salary of the eight law clerks on which S & B has provided information is, on a per annum basis, $41,082. (Salaries given are: $20/hr, $18/hr, $20/hr, $1,730/biweekly,

| 2,000 × $60 | $120,000 |
|---|---|
| Less 15% | 18,000 |
| | $102,000 |
| Less Average Salary and Assumed Overhead (50% of salary) | 61,500 |
| Net Profit | $ 40,500 |

Thus, S & B will receive about 100% profit on the salary paid to its law clerks if their work is billed at a rate of $60.00/hour. In the absence of contrary information or evidence from Applicant, that formulation will guide this ruling. Moreover, experience of this Court, both in former practice and on the bench, shows that work of law students employed as firm law clerks is not always fully useful. For all the foregoing reasons, rates will only be allowed up to $60.00/hour. Reductions of the time reported at rates over $60.00/hour must reduce the allowance for law clerks.

## (ii) Paralegals

Paralegals are being billed by S & B at a rate ranging from $55.00 to $75.00. Previously this Court allowed a rate of $45.00. As the paralegal salaries have since risen, during the period here under discussion, the rate allowed will now be increased to $55.00 based upon the data reported by S & B on which the following computation rests:[8]

| 2,000 hours × $55 | $110,000 |
|---|---|
| Less 15% | 16,500 |
| | $ 93,500 |
| Less Average Salary and Overhead reported by S & B | 71,213 |
| Net Profit | $ 22,287 |

S & B will receive about a 100% profit on the salaries paid to its paralegals upon

$18/hr, $1,615.38/biweekly, $20/hr, $1,615.38/biweekly). S & B shows overhead of $16,236 per law clerk. As salaries of law clerks, and associates have risen in recent years to new heights in the profession, so have law firm expectations for work hours reported by those persons which now often exceed 2,000/year. But we will for the present adhere to the con-

allowance of a rate of $55.00/hour. Therefore, rates in excess of that rate are disallowed.

## (iii) Specific Entries and Staffing

▇ S & B has often lumped a string of activities into long blocks of 5 to 10 hours. Also many of the daily entry descriptions are very general, for example "work on discovery". However, the proof of the value of the law suit effort lies in its results. It cannot be said that the time reported as a whole is disproportionate either to the complexity of the case or the results achieved. Therefore, it is not appropriate to discount for these matters as this Court would in other cases. The extravagance in staffing the case with large numbers of attorneys and others (3 partners, 5 associates, 3 law clerks, 9 paralegals and 5 other nonattorneys) ordinarily would compel this Court to reduce fees applied for. In not doing so here, the Court has once again considered that the proof of litigation efforts is in the results. Because of those results, this Court will not second guess the judgment of counsel in assigning work included in the lodestar. However, the allowance in the lodestar of generous billing rates for such heavy staffing is—under standards of *Skelton* previously discussed —another factor that justifies use of historic rates and a multiplier of 1.5 instead of that requested.

## (c) Computation of the Lodestar Amount at Historic Rates

As to the fees not yet ruled on, for work from July 1, 1986 to August 15, 1988, the Court will allow a lodestar based on historic rates, in the following amounts:

servative assumption of 2,000 annual billing hours.

8. The average salary of the eleven paralegals S & B has provided information on is $22,507 (salaries given are: $25,500, $17,500, $19,300, $34,000, $20,000, $26,400, $27,108, $18,500, $19,750, $19,760, $19,760). S & B claims overhead of $48,706 per paralegal.

## Historic Lodestar

| Name | Hours Expended | Historic Hourly Rate | Dollar Amount |
|---|---|---|---|
| **Partners:** | | | |
| JR Ferguson | 63.00 | $225 | $ 14,175.00 |
| | 99.25 | $205 | $ 20,346.25 |
| | 51.50 | $195 | $ 10,042.50 |
| | .50 | $180 | $ 90.00 |
| J Umana | 229.10 | $175 | $ 40,092.50 |
| | 1,288.50 | $160 | $206,160.00 |
| | 593.45 | $150 | $ 89,017.50 |
| FA Hainline | 22.50 | $175 | $ 3,937.50 |
| **Associates:** | | | |
| G Kaplan | 83.30 | $130 | $ 10,829.00 |
| ER Lubin | 19.30 | $135 | $ 2,605.50 |
| | 2.80 | $125 | $ 350.00 |
| TA Ngau | 122.00 | $135 | $ 16,470.00 |
| | 20.00 | $120 | $ 2,400.00 |
| RN Reback | 72.30 | $120 | $ 8,676.00 |
| DW Stanley | 20.80 | $135 | $ 2,808.00 |
| **Law Clerks:** | | | |
| ML Healy | 3.70 | $ 60 | $ 222.00 |
| AE Maxwell | 3.00 | $ 60 | $ 180.00 |
| K Simpson | 65.90 | $ 60 | $ 3,954.00 |
| **Paralegals:** | | | |
| E Babington | 1.70 | $ 55 | $ 93.50 |
| J Graf | 1,736.90 | $ 55 | $ 95,529.50 |
| M Mastrobattista | 237.60 | $ 55 | $ 13,068.00 |
| L Mitnick | 1.0 | $ 55 | $ 55.00 |
| M O'Neil | 67.20 | $ 55 | $ 3.696.00 |
| J Whetzel | 9.50 | $ 55 | $ 522.50 |
| G Winkler | 1.50 | $ 55 | $ 82.50 |
| K Conroy | 13.00 | $ 55 | $ 715.00 |

| Name Paralegals: | Hours Expended | Historic Hourly Rate | Dollar Amount |
|---|---|---|---|
| M Finegan | 3.50 | $ 55 | $ 192.50 |
| Paralegal or Law Clerk: | | | |
| MA Vidaurri | 76.60 | $ 60[9] | $ 4,596.00 |
| T Buchmeuller | 61.50 | $ 60 | $ 3,690.00 |
| M Cantor | 25.30 | $ 60 | $ 1,518.00 |
| AG Doll | 4.90 | $ 60 | $ 294.00 |
| J Carter | 3.50 | $ 60 | $ 210.00 |
| J Shurberg | 2.00 | $ 60 | $ 120.00 |
| TOTAL | 5,006.60 | | $556,738.25 |

#### (d) Expenses

S & B seeks reimbursement totalling $86,235.19 for the period of July 1, 1986 through August 15, 1988, for the following expenses:

| | |
|---|---|
| Air Fare | $23,419.00 |
| Business Meals/Lodging/Out of Town Transportation | 11,741.60 |
| Lexis Research | 3,507.17 |
| Duplicating and Binding | 15,383.43 |
| Long Distance Telephone Charges | 3,275.71 |
| Courier Services | 554.00 |
| Postage | 2,668.39 |
| Word Processing Costs and Other | 25,685.89 |
| TOTAL | $86,235.19 |

S & B only includes itemized records for the following expenses: air fare; business meals/lodging/out of town transportation; and courier services. In response to objections, S & B has represented that its photocopying charges are at a rate of 15¢ per page or less. The other expenses are unsubstantiated by any breakdown other than that given above.

#### (i) *Air fare*

The itemized records provided by S & B are not very precise. This Court has previously warned that fee applicants must specify that they are paying the coach rate for air fare. In the context of prior fee applications, S & B did confirm to this Court that the coach rate was being received. Therefore, this Court is entitled to assume all air fare requested is at the coach rate. The same appears necessary and reasonable and will be allowed in full.

#### (ii) *Business meal, lodging and out-of-town transportation*

The amounts requested for "business meals/lodging/out of town transportation" appears to include the following in the itemized disbursements: Meals, Misc. Expenses, Lodging, and the like. They appear reasonable in amount and necessary, and are allowed in full.

#### (iii) *Lexis*

Again S & B has not made any representation as to the necessity of this research. However, as discussed earlier, the Court will allow this expense because of the clear necessity for extensive research into many issues in the Class Action.

---

9. Since neither the Application nor the S & B supplement filed by S & B lists any of these people, this Court has calculated the lodestar using a $60.00 rate for each of the persons in this category for the hours reported, based on available information.

### (iv) *Duplicating and binding*

Although S & B does affirm that all photocopying is at a rate of 15¢ or less, it does not state what the number of copies were. At a rate of 15¢ per page this amounts to more than 100,000 copies (not taking into account any binding charge). Tree lovers will tremble at such a threat to the national forests, and the mind boggles at such a sea of paper. In the ordinary case, this Court inquires closely into such expenses and expects controls over copying practices. Here, however, any doubts about this will be resolved in favor of counsel whose work bore large fruit. Again, the allowance for this and other items where doubts have been resolved in favor of applicant, lends further support for the use of historic billing rates and a 1.5 multiplier.

### (v) *Long distance telephone*

No itemized records of these expenses are given. However, in light of the clear necessity to make a great number of long distance calls from Washington, D.C. to Chicago, the amount will be allowed in full.

### (vi) *Courier service*

The courier service charge appears to be a proper Federal Express charge on August 22, 1986, and will be allowed.

### (vii) *Postage*

Ordinary postage is a normal overhead expense and is taken into account in setting hourly billing rates of attorneys and others. Recovery will be allowed when air express or special delivery is required. S & B make no such specification. Furthermore, since "courier service" appears to be a Federal Express charge, it does not seem likely that the expense of "postage" would include other air express charges. Since S & B did not explain what was included in the postage expense it will be entirely disallowed.

### (viii) *Word processing*

Word processing costs are a part of a law firm's overhead expense subsumed in the average law firm's billing rates. Word processing has now replaced typing in most offices, and it is often (though not always) performed by an attorney's regular secretary since the ordinary typewriter is now as rare as the dodo bird in most law offices in this District. Therefore, even for firms that set up word processing departments, expenses for this secretarial-type work that is part of overhead expense cannot be recovered separately. The request for this expense will be entirely disallowed.

### (ix) *Total amount allowed*

Expenses of $57,880.91 will be allowed for the period of July 1, 1986 through August 15, 1988, after the disallowances set forth above.

### 6. *Conclusion*

S & B acted as class counsel for the Churchfield Estate and its creditors. Therefore, S & B is entitled to recover its fees under common fund principles. The lodestar approach is most favored by the Seventh Circuit in applying those principles. However, in light of Judge Eisen's retention order, the essentially non-contingent nature of retention, and the other factors discussed above, the lodestar should be computed at historic rates. Also, a 1.5 multiplier adequately compensates S & B for the risk of loss the firm faced, particularly in the light of factors discussed hereinabove.

S & B asks this Court to reconsider the disallowance ordered as to its first two interim fee applications. However, this Court cannot and will not do so on the basis of the one example given for which few details are provided, when no explanation was given as to why *in camera* showing was not offered at the time, and the work described did not warrant full payment. Those earlier adjudicated applications covered relatively short periods of time and were calculated at historic rates. On those two applications a total of $535,350.93 in fees ($505,056.43) and expenses ($30,294.50) were previously approved. At this time the Court will now disallow an additional $3,445.00 for time spent preparing and litigating those earlier fee petitions. Of the

approved fees and expenses for the first two applications S & B has received only $97,475.66, until the order of January 39, 1989, authorized advance payment on the instant ruling.

For the time period beginning January 1, 1986 and ending June 30, 1986, covered by S & B's Third Interim Fee Application, the Court will allow fees totalling $175,691.25 and expenses of $21,879.75.

For the time period beginning July 1, 1986 and ending August 15, 1988, covered by S & B's Comprehensive Fee Application, the Court will allow fees totalling $556,-738.25 and expenses of $57,880.91.

All other fees and expenses requested at any time, but not allowed hereinabove, are disallowed for reasons stated in prior fee orders and hereinabove.

Thus S & B is now entitled to the following amount:

| | |
|---|---|
| Total Historic Lodestar | 1,234,052.18 |
| Multiplier | × 1.5 |
| | 1,851,078.27 |
| Plus Expenses | + 110,055.16 |
| | 1,961,133.45 |
| Less Amount Previously Received | ( 97,475.66) |
| Less Interim Payment Per Order of January 30, 1989 | ( 750,000.00) |
| Amount Entitled to Now | 1,113,657.79 |

### D. THE COHEN, RAIZES & REGAL APPLICATION

#### 1. *History of Applicant*

Cohen, Raizes & Regal (CR & R) was retained by Churchfield on December 17, 1984 to act as special local Chicago co-counsel in connection with the Class Action. On January 11, 1985, Judge Toles of this Court entered an order approving Churchfield's retention of CR & R as special local co-counsel to assist lead counsel, S & B, in the prosecution of the Class Action.

#### 2. *Cohen, Raizes & Regal's Fee Requests*

CR & R has previously submitted to this Court four interim fee applications. This Court has ruled on three of those applications as follows:

| | |
|---|---|
| First Application | 12/17/84–03/31/85 |
| Requested | $9,848.50 |
| Provisionally Approved | $9,848.50 |
| Allowed for payment | $8,371.22 |
| Second Application | 04/01/85–08/31/85 |
| Requested | $9,298.00 |
| Provisionally Approved | $9,298.00 |
| Allowed for payment | $5,580.00 |
| Third Application | 09/01/85–12/31/85 |
| Requested | $7,157.50 |
| Provisionally Approved | $6,257.50 |
| Allowed for payment | $3,755.00 |

To date CR & R has only received $2,541.72 of the $17,706.22 fees allowed for payment.

This Court did not then allow 100% payment of the tentatively approved fees because the necessity and the value of CR & R's work could not be fully evaluated until the outcome was learned. Now that the Class Action Settlement is finally consummated, the value and necessity of CR & R's work has been established by the large settlement reached in the Class Action. Therefore, this Court will now allow payment of those fees previously approved tentatively but not earlier allowed for payment ($7,697.78).

In its Fourth Fee Application CR & R seeks fees totalling $7,230.00 for 80.2 hours expended on behalf of the Estate.

In its Comprehensive Application, CR & R seeks $26,424.00 in fees and $2,233.23 in expenses. CR & R also seeks a 1.75 multiplier on the fees presently being ruled on and on those previously approved. In support of this multiplier, CR & R relies on the case law and analysis set forth in Swidler & Berlin's Comprehensive Application. CR & R contend that as co-counsel for the plaintiff class in the Class Action, the same legal standards which govern Swidler & Berlin's fee application govern its fee application with the one distinction that Swidler & Berlin is lead counsel.

#### 3. *Standard of Fee Award*

This Court finds that CR & R cannot recover under the common fund theory. CR & R was not the usual class counsel, but rather was local Chicago counsel em-

ployed by Debtor to assist the Washington, D.C. class counsel on a non-contingent fee basis. Such assistance was rarely required in substantive areas except as to a few areas of Illinois law. Its major function was to assist S & B in ministerial work and to avoid necessity of S & B's travel from Washington and appearance in routine matters. Its risks were no different than any other attorney doing bankruptcy work. That is, its ultimate recovery could at all times be affected by the size of the estate and the degree of success achieved as well as other recognized considerations. Its risks in that regard were considerably less than those of lead class counsel because CR & R's responsibilities and commitment of time and resources were much less.

■ The Court will therefore award fees under usual bankruptcy standards, and has considered and now denies the enhancement request under "fee-shifting" standards. CR & R is not entitled to enhancement of its lodestar under standards previously discussed. Its work was ordinary, albeit necessary. CR & R will therefore be awarded its historic rates as requested by it. Since it is properly compensated on the same basis as usual bankruptcy counsel, this firm may recover its work in preparing fee petitions, within reasonable and proportionate limits.

### 4. *Fourth Application*

■ In its Fourth Interim Fee Application, CR & R seeks fees for 80.2 hours expended for a total of $7,230.00. The application covers the period from January 1, 1986 to September 30, 1986. A large portion of this request is for time expended preparing and litigating CR & R's fee applications (23.7 hours; $2,097.00). Also a sizeable amount of time was spent working on Swidler & Berlin's fee applications (11.-45 hours; $981.00). Several parties object to the large proportion of time spent on the fee applications.

In *In re Wildman*, 72 B.R. 700 (Bankr.N.D.Ill.1987), this Court reasoned that in the absence of unusual circumstances, the hours allowed for preparing and litigating an attorney's fee application should not

exceed three percent of the total hours applied for. While authority supports reasonable compensation for preparing fee applications in bankruptcy, such award shall not be disproportionate or be allowed for unnecessary work. Fair compensation is in order; however, such work is not intended as a new profit center or bonanza.

CR & R contends that its position involved unusual circumstances justifying a higher percentage for fee preparation. In response to objections it argued the following:

5. The time required for CR & R and Swidler to prepare a fee application is greater than the other applicants in this proceedings, by reason that the aforesaid firms, who are co-counsel to the class action litigation, must take great care to review and edit all time entries in order to omit any information which is privileged, confidential, or sensitive in connection with the class action litigation. Furthermore, it is obvious from the history of this matter that CR & R must anticipate vigorous cross-examination from Winston & Strawn, and accordingly additional time and preparation for hearings on the applications is required on the part of CR & R.

. . . .

8. . . . . The objection that the amount of time spent by CR & R on fee application matters is too high a percentage of its total fee application is an invalid objection. The percentage may be higher than the other fee applications but this is only because the total amount of fees sought by CR & R in this fee application is less than other applicants.

CR & R's Response to Objections to Fourth Application, at 2–4.

This Court does not agree that CR & R had to closely edit its time entries before submitting them to this Court. That would have been an appropriate concern of S & B. CR & R as the local counsel for S & B, was not hired to be involved generally in substantive work, but was to appear on S & B's behalf and see to filing of pleadings when it was not necessary for S & B people

to come to Chicago from Washington, D.C. Moreover, all editing needs could easily have been rendered unnecessary by offering to file complete time sheets and descriptive narrative *in camera* with limited access to all parties other than Winston and Strawn, and under protective orders.

In addition, CR & R did not need an unusually high proportion of time to prepare its fee applications. The amount of the fees sought by it is less than many of the other applicants. However, that does not mean that CR & R should be permitted to bill a higher percentage of hours for fee preparation. Rather, having less substantive responsibility meant it should have been much easier for CR & R to prepare its fee applications and even edit them quickly when necessary.

It is important that attorneys practicing in the Bankruptcy Courts prepare fee applications efficiently. If they are to be paid under 11 U.S.C. § 330 like attorneys outside of this practice field (who are not usually paid for preparing their bills or providing explanatory detail), they must maintain records to provide all necessary fee information efficiently—as do most attorneys in the profession.

All claimed hours for CR & R fee application work total 42% of its time on substantive work [10] (23.7 (hours on CR & R fee petition) divided by 56.5 (hours on substantive work) = 42%). Bending over backwards to be fair, this Court will allow 10% instead of the usual 3%, and will therefore reduce the hours of fee preparation by 18.05 hours (23.7 − 5.65 = 18.05), for a total fee reduction of $1,597.09.

CR & R is therefore allowed only $5,632.91 for services rendered on behalf of the Estate under its Fourth Application.

**10.** This includes time spent on S & B's fee application within the hours of substantive work.

**11.** CRR also spent a portion of 4.1 hours on fee work which this Court does not add in when figuring the percentage of time spent on fee work, or when making disallowance.

CRR may also have worked on Swidler & Berlin's fee application for a small portion of the time included in the 47.2 hours. Several fee work entries state that CRR telephoned Swidler & Berlin. However, only one entry for .3 hours

### 5. *Comprehensive Application*

In its Comprehensive Application, CR & R seeks $26,424.00 in fees for the period from October 1, 1986 to July 27, 1988. The Comprehensive Application also seeks expenses of $2,233.23 for the period of January 1, 1985 through July 27, 1988.

CR & R again seeks a high proportion of time for preparation and litigation of its fee applications (47.2 hours = 24% of its time spent on the main case).[11] As stated above, this percentage of total work is too high and will be decreased to 10% (19.27 hours will be allowed). A reduction of $3,343.03 will therefore be ordered.

CR & R seeks a 1.75 multiplier of those fees not yet approved and those already approved. However, since it is treated under "fee shifting" and normal bankruptcy standards, that request will be treated as one for enhancement. CR & R does not meet the standards for enhancement because it did not show with specific evidence why results obtained and the relatively small risks incurred were not reflected in either the standard hourly rates allowed or the number of hours allowed. No special or exceptional performance has been demonstrated. This firm has utterly failed to show its entitlement to enhancement under standards discussed hereinabove.

CR & R seeks recovery for a great deal of document review including review of the following:

1. File re objections to Magistrate on E & S (a portion of .7 hrs) 10/22/86

2. Plaintiff's memorandum in support of objections to Magistrate's protective order (.3 hrs) 11/03/86

3. Umana corresp. and docs for motion re discovery (.3 hrs) 11/26/86

states that CR & R actually did any work for the benefit of S & B ("TC Umana [Swidler & Berlin attorney] re filing proof of claim, letter to Molinaro with copies of proofs of claim for CR & R and Swidler and Berlin"). Since is does not appear that any substantial amount of time was spent on Swidler & Berlin's fee application, the Court has not attempted to exclude from the 47.2 hours any amount of time spent on Swidler & Berlin's application.

4. W & S answers to interrogatories (.3 hrs) 12/15/86

5. Umana and W & S opening statements (a portion of 1.2 hrs) 3/2/87

6. Umana Settlement Opening Statement (.8 & 1.0 hrs) 3/10/87 and 3/15/87

7. Bankruptcy filing (.3 hrs) 3/27/87

8. W & S's motion to stay and reset discovery (a portion of .7 hrs) 3/31/87

9. Settlement article in newspaper and send copy of same to Umana (.3 hrs) 5/5/87

10. Disclosure Statement and Liquidating Plan re class action settlement issues (.4 hrs) 10/2/87

11. Correspondence relating to W & S settlement and proposed amended complaint (.3 hrs) 10/5/87

12. Amended Disclosure Statement and Amended Plan (.3 hrs) 11/19/87

13. W & S's objection to Magistrate's ruling on motion to dismiss CT & T (.3 hrs) 11/20/87

14. Response and Objections filed by Umana, Herbst and Veldt re Trustee's motion to approve settlement (a portion of 1.0 hrs) 11/30/87

15. Order settling class action (.2 hrs) 12/08/87

16. Trustee's Order Authorizing Settlement and CT & T's Memo re Magistrate's Report (.4 hrs) 12/21/87

17. Copies of docket sheet and other info re claims of professionals for fees, and discuss with Umana re impact on settlement (1.2 hrs) 6/8/88

The foregoing entries are either too cryptic to justify allowance in full or report too much time for the work reported. Such time and those entries will be disallowed by 50% for that reason. The disallowance of 4.1 hours for this reason totals $465.37.

CR & R also carried on research which was of questionable necessity or value to this estate, or was work to be done by primary class counsel including the following:

1. Research procedure for objecting (a portion of .9 hrs) 10/2/86

2. Research re objections to Magistrate's ruling on discovery matters (a portion of .6 hrs) 10/3/86

3. Research re deposition subpoena for out-of-state witnesses (a portion of .8) 3/17/87

Without further detail being supplied, those entries were considered for disallowance. However, since that CR & R research was conducted in relatively short periods of time and was likely requested by lead counsel, it will be allowed.

 CR & R seeks compensation for sending a Law Bulletin settlement article to Swidler & Berlin and also for sending a copy of June 2, 1987 Chicago Tribune article to Swidler & Berlin. Such "work" of clipping articles and stuffing them in envelopes for mailing should be done by secretarial staff and will not be compensated. Therefore, this Court will disallow .6 hrs of BJW's time for that effort. Such disallowance totals $66.00.

CR & R is allowed $22,549.60 for services rendered under its Comprehensive Application ($26,424.00 minus $3,343.03 for excessive time in preparation of fee applications, minus $465.37 for review work, minus $66.00 for sending articles).[12]

**12.** Should this Court be in error in not using the common fund approach for these counsel, the following alternative calculation under that approach has been made for benefit of counsel and any reviewing court.

Under the common fund theory S & B may not recover attorney fees for the preparation and litigation of any of their fee applications in light of authority discussed hereinabove. This Court would therefore disallow all attorney's fee for preparation of the various applications of CR & R and the work on the application of Swidler & Berlin. This would be done as to all

their past and present applications. Therefore, the Court would disallow $2,976.00 for fee petition work recovered in CR & R's Second Application and $3,169.50 for fee petition work recovered in the Third Application.

*Fourth Application*

In its Fourth Interim Fee Application, CR & R seeks fees for 80.2 hours expended for a total of $7,230.00. The application covers the period from January 1, 1986 to September 30, 1986. A large portion of this request is for hours expended preparing and litigating CR & R's fee applica-

### 6. *Conclusion*

CR & R may not recover under the common fund theory since CR & R lacked the responsibility of the usual class counsel. CR & R will be allowed historic fees as requested but it will not be allowed a multiplier under common fund rules because its lodestar adequately reflects its work, the results obtained, the complexity of its work, and any risk of loss faced by CR & R. Likewise, no fee enhancement is warranted.

CR & R is therefore entitled to recover only the following amounts after payments received during the case:

| | |
|---|---:|
| 1. Amounts previously allowed but not yet received. | $15,164.50 |
| 2. Amounts previously tentatively approved but not previously allowed for payment. | $ 7,697.78 |
| 3. Amounts allowed under the Fourth Application. | $ 5,632.91 |
| 4. Amounts allowed under CR & R's Comprehensive Application. | $22,549.60 |

tions (23.7 hours; $2,097.00). Also a sizable amount of time was spent working on Swidler & Berlin's fee applications (11.45 hours; $981.00). As stated above, 35.15 hours ($3,078.00) would be disallowed under the common fund theory.

Thus, the lodestar that would be awarded to CR & R would equal $4,152.00.

#### Comprehensive Application

In its Comprehensive Application, CR & R seeks $26,424.00 in fees for the period from October 1, 1986 to July 27, 1988. The Comprehensive Application also seeks expenses of $2,233.23 for the period of January 1, 1985 through July 27, 1988. CR & R seeks a 1.75 multiplier of those fees not yet approved and those already approved.

CR & R again seeks a high proportion of their time for preparation and litigation of its fee applications (47.2 hours). This time would be wholly disallowed under the common fund theory. A disallowance of $5,649.50 would thereby be made. The disallowances made above for review time and sending articles would also be made ($465.37 and $66.00). Therefore, CRR would recover a lodestar amount of $20,243.13 and expenses of $2,233.23.

As discussed under Swidler & Berlin's Application, the maximum multiplier the Court would consider would equal 1.5 for the same reasons S & B was limited to that multiplier.

Thus CR & R is presently entitled to a total of $51,044.79 in fees with no enhancement, less the $30,000.00 in additional payment received as interim payment pursuant to order dated January 30, 1989.

CR & R requests expenses in the amount of $2,233.23. This Court finds all expenses to be reasonable and at this time allows the entire amount requested.

### E. THE PORTES, SHARP, HERBST & KRAVETS APPLICATION

#### 1. *History of Applicant*

David I. Herbst and the law firm of Portes, Sharp, Herbst & Kravets (PSH & K) were retained on June 13, 1984, by Lee R. Martin, Minnie E. Schimpf, James H. Reddy and Tress K. Reddy ("the Martin plaintiffs") to represent them individually and as representatives of a class of persons and entities who purchased Money Market Mortgages from Churchfield.

PSH & K determined that the Money Market Mortgage holders had a meritorious claim against Churchfield, its officers and directors, and three law firms which had represented Churchfield in connection

Since CR & R's risk and responsibility was materially smaller than that of Swidler & Berlin, this Court would only award a 1.25 multiplier.

Therefore if CR & R were to recover under the common fund theory it would be allowed the following amounts:

| | |
|---|---:|
| Amounts previously allowed for payment but not yet received | $15,164.50 |
| Amounts previously approved in amount but not for payment | 7,697.78 |
| Fourth Application | 4,152.00 |
| Comprehensive Application | 20,243.13 |
| Less amount for fee work already recovered in Second & Third Applications | ( 6,145.00) |
| Multiplier (equals total lodestar of $43,654.13 times .25) | 10,913.52 |
| | 52,025.93 |
| Less amount received as Interim payment pursuant to January 39, 1989 Order | (30,000.00) |
| Total Amount of Fees to be Received if Counsel were treated under common fund rules | $22,025.93 |

Expenses of $2,233.23 would also be allowed.

with the issuance and sale of the Money Market Mortgages. However it could only sue the officers, directors and attorneys, but not Churchfield because the automatic stay in bankruptcy stayed all proceedings against Churchfield.

On June 29, 1984, suit was filed by PSH & K on behalf of Martin and others, and was assigned to District Judge Plunkett. Swidler, Berlin & Strelow (now Swidler & Berlin) filed its suit asserting related and additional legal theories on December 24, 1984. Until that time, PSH & K was unaware that Swidler & Berlin had been retained by Churchfield and approved by the Bankruptcy Court to assess Churchfield's cause of action with regard to Debtor's program of first and second mortgages.

Early in 1985, it became apparent that the two lawsuits involved similar factual allegations and should not be prosecuted separately. PSH & K and Swidler & Berlin began discussions, attempting to avoid duplication of work. They reached an agreement, subject to approval of the District Court, which contemplated the voluntary dismissal of the *Martin* case and the simultaneous intervention by the Martin plaintiffs in the *Churchfield* case. Under that agreement, Swidler & Berlin was to act as lead counsel and PSH & K was to act as co-counsel on behalf of the Money Market Mortgage investors. On September 19, 1985, Judge Plunkett entered an order in accord with the agreement. The order expressly preserved the right of David I. Herbst to claim award, at a later date, for fees and reimbursement of expenses incurred in the *Martin* case prior to it being dismissed. After that date, virtually all work on the case was performed by the S & B firm, not PSH & K. While PSH & K's legal theory was useful to the ultimate result, the firm did not make a major work contribution to the litigation.

On January 1, 1988, after almost all of the PSH & K work was completed, on motion of the Trustee for Churchfield, this Court authorized Trustee to employ David I. Herbst and PSH & K as special counsel on behalf of Churchfield's Estate effective as of June 12, 1984, to prosecute the Churchfield Class Action on behalf of Money Market Mortgage holders. Under the order, compensation of such attorneys was to be fixed by further order of this Court. The effect of the order was to avoid expensive disputes of the attorneys before two courts over fees applied for by the various class counsel, and to avoid disputes over the relative value to recovery of the different legal theories initiated by these counsel on behalf of many of the same people whose interests were ultimately represented by S & B. The unusual order on its face allowed retrospective appointment long before PSH & K applied for such appointment. However, that order was less a retrospective approval of counsel's appointment and more an order approving the submission by PSH & K of its fee application to this Court instead of to the District Court. This estate and S & B clearly benefited to some degree by PSH & K's work, and the need to avoid expensive disputes between the different counsel before two courts was manifest.

### 2. *Applicant's Fee Request*

PSH & K received no retainer in connection with its representation of the Money Market Mortgage investors, and has not received any payment for services rendered or as reimbursement for expenditures made in connection with the Class Action. Its work was wholly contingent; this firm bore all the risks of usual class litigation counsel outside of bankruptcy. This is PSH & K's first application to any court for fees or expenses incurred in connection with the litigation.

PSH & K seeks funds under the common fund theory. It also relies on § 330 of the Bankruptcy Code for the proposition that its fee should equal the amount that would be awarded to it were this not a bankruptcy case.

Relying on the factors developed in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974), PSH & K requests that the Court apply a multiplier of 2.0 to its lodestar fees.

PSH & K request lodestar fees of $106,-728.00 times a 2.0 multiplier, for a total of

$213,456.00. The firm also requests reimbursement for expenses totalling $3,506.44.

### 3. *Common Fund Principles and Current Lodestar Rate to be Used by this Court*

#### (a) Common Fund Principles

██ PSH & K's reliance on § 330 of the Bankruptcy Code is correct. Under § 330, bankruptcy attorneys are to be compensated at a rate comparable to that received in non-bankruptcy cases. Therefore, PSH & K will be awarded fees under the common fund doctrine.

#### (b) Use of Current Rates to Compute Lodestar

Furthermore, PSH & K was involved in the case for almost five years working on a wholly contingent basis, and the firm has not received any compensation to date. It will be awarded its lodestar at current rates to account for the long delay in payment, in accord with standards generally applied to class action litigators outside of bankruptcy whose work is wholly contingent.

#### (c) Application of a Multiplier

██ PSH & K seeks a multiplier of 2.0 relying on the following factors:

1. Preclusion of other employment and time limitations imposed.
2. The amount involved and the results obtained.
3. Whether the fee negotiated with the client is fixed or contingent.
4. The novelty and difficulty of the questions involved in the litigation.
5. The "undesirability" of the case.

In light of the standards developed in *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), *Pennsylvania v. Delaware Citizens' Council for Clean Air (I)*, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986), *Pennsylvania v. Delaware Citizens' Council for Clean Air (II)*, 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987), and *Skelton v. General Motors Corp.*, 860 F.2d 250 (7th Cir.1988), *reh'g denied*, and in the light of the relatively limited work performed by this firm, this Court finds that the lodestar to be allowed adequately reflects and compensates for all the above factors except the third (contingency of payment).

Under this Bankruptcy Court's order authorizing employment of PSH & K, its fee was completely contingent on favorable recovery in the Class Action:

.... David I. Herbst also having represented to the Court that if the proposed settlement of the Class Action Suit aborts, he and the firm will not apply for compensation and reimbursement of expenses to be paid from assets of CHIC's estate other than proceeds from any subsequent settlement or judgment in the Class Action Suit; ....

Order entered January 1, 1988, pg 2. Prior to that order, its work was at all times fully contingent on success.

The court in *Skelton* found that a doubling of the lodestar provides a proper ceiling in a case where lead counsel's recovery is wholly contingent. Because this court finds that PSH & K's recovery was wholly contingent, PSH & K must be awarded a multiplier. However, because its work and responsibility was so limited, likewise its risk of nonpayment was limited. As discussed earlier, S & B's work was extensive but its recovery of fees not wholly contingent. Because S & B's risk was thereby limited, it was awarded only a 1.5 multiplier. On the other hand, PSH & K's fees were contingent but its work commitment was relatively limited, so its risk was likewise limited. Accordingly, it will also be awarded a 1.5 multiplier.

### 4. *PS & H Fee Application*

#### a. Specific Disallowances of fees

##### (i) *Fee petition work*

Based on authority cited in the first part of this opinion, attorneys recovering under the common fund theory are not entitled to attorney's fees for preparing or litigating their fee petitions since the class is not benefitted thereby. Therefore, the 21.75 hours requested by PSH & K for such work will be disallowed (a fee disallowance of $3,588.75).

### (ii) *Partner hours*

■ A great portion of work was done by partners at rates up to $200.00. No law clerks were used, and only four hours of paralegal time were shown.

It appears much of the research and some of the other work done by partners should have been done by an associate. For example, in June of 1984 a $200/hour attorney spent 9.25 hours in legal research (some specified as research on securities law and some not specified as to the subject research), and one hour checking the Churchfield bankruptcy file. On January 28, 1985, that partner spent 1.15 hours researching class certification, and on May 4, he spent 4.75 hours researching class issues. Also, on April 10, 1985, this same attorney spent 1.25 hours examining the court file in *Churchfield v. Winston & Strawn.* PSH & K did state that prior to September 19, 1985, the firm had only two litigation attorneys, a $200/hour partner and a $135/hour associate. Having only two attorneys in the department may have forced work on the partner that normally would have been assigned to an associate, but the estate should not bear the burden of the firm's staffing level. Therefore, the 17.40 hours of work stated above will be compensated at a rate of $115/hour rather than $200/hour. Accordingly, a disallowance of $1,479.00 will be made.

Furthermore, some work that should have been done by a paralegal was done by a $135.00/hour attorney. For example, on June 29, 1984 the attorney spent .75 of an hour locating addresses of defendants. On April 2, 1985, a $115/hour attorney spent one hour cite-checking a brief. This work will be reduced to a rate of $45/hour. A disallowance of $137.50 will be made.

### b. Computation of Lodestar Amount at Current Rates

PSH & K seeks a lodestar amount of $106,728.00. From this amount this Court will deduct $3,588.75 for hours expended on fee application work, $1,479.00 for associate work performed by a partner, and $137.50 for paralegal work performed by an attorney. Therefore, PSH & K is presently allowed a current lodestar of $101,-522.75. As stated above this amount will be multiplied by 1.5. Thus, $152,284.12 is allowed to PSH & K as fee compensation.

### c. Expenses

PSH & K seeks the following expenses:

| Computer Research | | |
|---|---:|---:|
| June, 1984—December, 1984 | $1,514.00 | |
| May, 1985 | 55.40 | |
| June, 1985 | 95.00 | |
| November, 1987 | 54.45 | |
| December, 1987 | 134.57 | |
| | | $1,853.42 |
| Travel | | |
| August 12, 1985 D. Herbst to Washington, D.C. for meeting with Umana and Ferguson | | 511.45 |
| Special Postage | | 87.34 |
| Photocopying | | 564.28 |
| Filing Fee and Service of Summons | | 92.50 |
| Court Reporter | | 397.45 |
| **TOTAL** | | **$3,506.44** |

PSH & K makes no showing as to the necessity of computer research. Therefore, generally this amount would be disallowed. However, as stated in the discussion of Swidler & Berlin's Application, because of the novelty and complexity of this case the Court will allow recovery of this expense. All other expenses appear reasonable and necessary and they are also allowed.

PSH & K is therefore allowed $3,506.44 in expenses.

### 5. *Conclusion*

PSH & K properly seeks fees under the common fund approach. Furthermore, its fee was wholly contingent on a favorable result in the Class Action but its work commitment was relatively limited. Because its risk was thereby limited, a multiplier of only 1.5 will be allowed. Further, PSH & K waited almost five years to receive any compensation for the work in this case or in the *Martin* case which it began long ago. Therefore, the lodestar will be computed using current rates as requested.

From the requested lodestar, $5,205.25 has been deducted. A lodestar amount of $101,522.75 will be allowed and paid. This amount will be multiplied by 1.5, thereby allowing $152,284.12 as total compensation for hours worked, less $55,000.00 allowed

as interim payment pursuant to order dated January 30, 1989. PSH & K will also be allowed full reimbursement for expenses totalling $3,506.44.

## F. THE KATTEN MUCHIN & ZAVIS APPLICATION

### 1. *History of Applicant*

On October 19, 1984, the United States Trustee was authorized and directed to appoint a limited trustee in Debtor's Chapter 11 proceeding. Daniel M. Pelliccioni was appointed as a limited trustee in this case to exercise the rights and powers of Debtor and to perform its duties as a general partner or co-general partner in Churchfield Properties Partnerships I, II, III, IV, V, VI and IX.

Subsequently, the Court found that cause existed for appointment of a fully empowered trustee for Debtor's entire estate. On August 20, 1986, the United States Trustee was ordered to appoint such a trustee. This Court approved appointment of Daniel M. Pelliccioni ("Trustee") as fully empowered trustee for Debtor's estate in this Chapter 11 proceeding, with Debtor's rights, powers and duties as a general partner or co-general partner in the aforementioned limited partnerships and also in Churchfield Properties Partnership X.

The Court originally authorized Trustee to retain Katten, Muchin, Zavis, Pearl & Galler presently known as Katten Muchin & Zavis (KM & Z) as his attorneys in this proceeding effective October 22, 1984, with compensation to be paid pursuant to further order. After Trustee's duties were expanded, on September 9, 1986, the Court authorized the Trustee to retain KM & Z as his attorneys for all purposes in this proceeding effective as of August 26, 1986, with compensation to be paid pursuant to further order.

### 2. *Katten Muchin & Zavis's Fee Request*

KM & Z has previously submitted to this Court three interim applications for fees and expenses. This Court has ruled on two of those applications with the following total awards:

| First Application | 10/22/84–05/30/85 |
|---|---|
| Requested | $49,691.48 |
| Provisionally Approved | $45,136.48 |
| Allowed for payment | $36,680.38 |
| | |
| Second Application | 06/01/86–01/31/86 |
| Requested | $47,122.48 |
| Provisionally Approved | $45,101.48 [13] |
| Allowed for payment | $36,655.08 |

To date KM & Z has received $60,230.11 of the $73,335.46 fees allowed for payment. The Court will now allow those fees previously tentatively approved but not earlier allowed for payment, totalling an additional $16,902.50.

In its Third Application, KM & Z seeks $101,117.00 [14] in fees and $9,127.99 in expenses for the period of February 1, 1986 through August 25, 1986.

In its Fourth Application, KM & Z seeks $602,372.75 [15] in fees and $66,509.92 in expenses for the period of August 26, 1986 through June 30, 1988.

### 3. *Standard of Fee Award*

KM & Z seeks to recover its fees at its historic rate plus a premium of $201,926.00 based on the results achieved for Debtor's estate.

The Court will award historic rates and enhancement in an amount determined to be proper under enhancement standards previously enunciated for bankruptcy cases, i.e., where the common fund analysis is not applicable. These are not class action counsel and cannot claim the benefit of common fund standards.

(a) Trustee Time versus Attorney Time

In both applications Three and Four, Daniel M. Pelliccioni seeks some compensation for his firm at his usual attorney's

---

13. This Court's Second Interim Compensation Order mistakenly stated that $2,769.48 in reimbursements were approved and allowed. The correct amount approved is $2,869.48.

14. Amount requested is the amount requested in its Application minus 9 hours @ $200 reduced by Trustee's Response to Objections of Second

Secured Creditors Committee, plus 1 hour @ $200 which the Court determined was not included in the Application total.

15. Amount requested is the amount requested in its Application less reductions orally stated by KM & Z at the fee hearing.

billing rate in addition to compensation he is requesting as Trustee. The Second Secured Creditors Committee and the United States Trustee object, arguing that allowing Pelliccioni to recover at his attorney's rate would provide double compensation.

As stated by Professor Ginsberg:

A trustee who serves as trustee *and* as attorney or accountant to the trustee can be awarded a fee up to the maximum percentages allowable for services rendered as trustee *plus* compensation at appropriate rates for the professional services. However, the court must separate the services the trustee rendered as trustee from those rendered as attorney or accountant to ensure that the trustee does not receive double compensation for the same services. In addition, the trustee must have been authorized by the court to serve in both capacities.

*Bankruptcy*, Ginsberg, Robert E. (Prentice–Hall Law & Business 1986 with 1988 supplement). *See also, In re Santoro Excavating, Inc.*, 56 B.R. 546 (Bankr.S.D.N.Y. 1986), *reh'g denied* 58 B.R. 131 (Bankr.S.D. N.Y.1986).

The court in *In re Whitney*, 27 B.R. 352 (Bankr.D.Me.1983), found that the delicate task of distinguishing trustee's services from attorney's services requires that the fee application contain " 'sufficient detail to enable the court to determine the precise services performed, the time expended, the problem involved, its difficulty, the purpose of the action taken and the resolution reached, as well as the benefit to the estate.' " *Whitney*, 27 B.R. at 354, *citing to In re McAuley Textile Corp.*, 11 B.R. 646, 648 (Bankr.D.Me.1981).

Mr. Pelliccioni has not filed time records for his work done as Trustee. Although a trustee need not in uncomplicated cases keep time records for Trustee work, the lack of such records in a case as large as this makes it difficult for the Court to determine whether those hours listed as attorney work should be compensated at the attorney's hourly rate or whether they are adequately covered by the fee to be awarded to the Trustee. Mr. Pelliccioni is the head of the Finance and Reorganization Department at KM & Z, and is the partner in charge of supervising all matters worked on by that firm and its special counsel, including litigation involving the Trustee and Churchfield. This Court must now determine the amount of time Mr. Pelliccioni should be allowed to recover as an attorney separate from his role as Trustee. Trustees in large cases are well advised to keep time records for trustee work, so as to aid the Court (and themselves!) in this type of analysis.

(b) Enhancement Standards

The request of KM & Z for fee enhancement over its hourly rates must be considered under "fee shifting" enhancement standards applicable to bankruptcy generally rather than under the common fund theory. Under *Blum v. Stenson*, 465 U.S. 886, 899, 104 S.Ct. 1541, 1549, 79 L.Ed.2d 891 (1984), discussed hereinabove, enhancement for success achieved is justifiable only in rare case "where the fee applicant offers specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was 'exceptional'."

### 4. *Katten Muchin & Zavis's Third Application*

#### (a) Amount of Fees and Expenses Sought

In its Third Application, KM & Z seeks $101,117.00 in fees and $9,127.99 in expenses for the period of February 1, 1986 through August 25, 1986.

This application fails to follow the standards announced by this Court in the case of *In re Wildman*, 72 B.R. 700 (Bankr.N.D. Ill.1987), as to the format of a fee application. In *Wildman*, 72 B.R. at 711, this Court held that time records should be kept and reported chronologically by *activity or project* rather than by attorney. KM & Z lists all work together in one chronological exhibit. Each entry does contain a letter signifying what project the time entry involved. For each project the Court has reviewed, it was therefore necessary to look through the entire time record, rather than looking at a consolidated time record

grouping entries involving each project. The Court will not require amendment to this application, but these attorneys are advised that this Court will not hereafter spend the large amount of additional time necessary to look through an entire time record when evaluating each project for which fees are sought.

(b) Specific Requests for Fees

(i) *Project A: Formulate, Negotiate and Document Settlements between Partnerships and Debtor*

KM & Z seeks $30,084.50 (269.50 attorney hours, 12.50 paralegal hours) for formulating, negotiating and documenting the settlements between the Partnerships and the Debtor. KM & Z assisted the Trustee in settlements between six (6) of the Partnerships and Debtor. The settlements provided for either sale or refinancing of properties owned by the Partnerships. Applicant also prepared necessary closing documentation for loan refinancing for Partnerships II, IV and IX relating to the consummation of their respective settlements with Debtor.

Twenty-four (24.00) hours of work is reported by Mr. Pelliccioni on this project. Mr. Pelliccioni's time on this Project can be broken down into three categories:

1. Review of settlement documents and pleadings — 10.60 hours
2. Conference with other attorneys at KM & Z — 10.20 hours
3. Prepare for hearing and attend hearing — 3.20 hours

Attending conferences with other attorneys at KM & Z was a task Mr. Pelliccioni performed primarily in his role as Trustee rather than in his role as another attorney. Therefore, two-thirds of the conference time will be disallowed—a disallowance of 6.80 hours at $200.00/hour ($1,360.00). The remainder of the fees sought for this Project are allowed.

(ii) *Project B: Defend Suits by Debtor Against the Trustee*

KM & Z defended several adversary proceedings begun by the Debtor relating to the Partnerships. While defending those suits, KM & Z uncovered information indicating that the Debtor may have tried to hinder the consummation of settlements earlier referred to (Project A). KM & Z therefore researched possible imposition of sanctions against the Debtor. The applicant seeks $12,421.00 (100.10 attorney hours, 1 paralegal hour) for services performed on this Project.

Pelliccioni seeks 14.80 hours of compensation at his attorney rate for work on this Project. His work can be divided as follows:

1. Review of pleadings — 5.40 hours
2. Conferences with other attorneys — 2.20 hours
3. Review of pleadings together with conference — 3.80 hours
4. Prepare and attend settlement hearing with Debtor — 3.40 hours

One and one-half hours of conference time will be disallowed (1½ @ $200 = $300.00) as being trustee work.

In three instances, two attorneys each seek compensation for a conference meeting between themselves. If in excess, this might require a deduction. However, since the duplicated time is small, no deduction is appropriate.

(iii) *Project C: Participation in U.S. Trustee's Motion to Expand the Duties of Trustee*

KM & Z defended against the Debtor's apparent attempt to discredit the Trustee. Applicant's work included responding to Debtor's request to produce documents, responding to various emergency motions filed by Debtor, preparing the Trustee for his deposition, preparing the Trustee for his examination at trial, attending depositions of key witnesses and a limited portion of the trial, and preparing a memorandum filed to address the role of the Trustee in this proceeding. Applicant seeks $23,519.00 (205.50 attorney hours, 15.40 paralegal hours) [16] for services performed on this Project.

There was a great deal of work duplication by attorneys on this project including conferencing between two or more attor-

---

**16.** Amount requested is the amount requested in its Application less 7.8 hours @ $200 reduced by Trustee's Response to Objections of Second Secured Creditors Committee, plus 1 hour @ $200 which the Court determined was not included in the Application total.

**876**

neys and two or more attorneys attending the same deposition. The following entries are pertinent to this:

| | | | |
|---|---|---|---|
| 7/10/86 | Molinaro | Conference with SBK re discovery against Debtor | .20 |
| 7/10/86 | Keywell | Telephone Conference with M. Molinaro re deposition | .20 |
| 7/15/86 | Molinaro | Attend deposition of L. Dominguez | 3.10 |
| 7/15/86 | Keywell | Attendance at deposition of L. Dominguez | 5.50 |
| 7/16/86 | Molinaro | Attend Deposition of L. Dominguez | 4.50 |
| 7/16/86 | Keywell | Attendance at 7:00—9:00 session of Dominguez deposition | 2.30 |
| 7/16/86 | Keywell | Conference with M. Molinaro re deposition of Lee Dominguez | .30 |
| 7/17/86 | Keywell | Conference with M. Molinaro, report of deposition of Lee Dominguez | .40 |
| 7/17/86 | Molinaro | Conference with SBK re Domingue [sic] testimony | .20 |
| 7/17/86 | Sherman | Meeting with Mike Molinaro re appearance at deposition of Dominguez | .20 |
| 7/17/86 | Molinaro | Conference with M. Sherman re attending Domingue [sic] deposition | .20 |
| 7/18/86 | Sherman | Discussion with Mike Molinaro re deposition of Dominguez | .20 |
| 7/18/86 | Molinaro | Conference with SBK and M. Sherman re preparation of deposition of Dominguez | .90 |
| 7/18/86 | Keywell | .... conference with D. Pelliccioni and M. Molinaro,.... | 2.00 |
| 7/18/86 | Molinaro | Conference with DMP and SBK re subpoena on DMP produce | .50 |
| 7/28/86 | Keywell | Conference with M. Molinaro and D. Pelliccioni re trial,.... | .80 |
| 7/28/86 | Molinaro | Confer with SBK and DMP re trial participation | .50 |
| 7/30/86 | Keywell | Telephone conference with M. Molinaro re hearing on motion | .30 |
| 7/31/86 | Molinaro | Conference with SBK re status of trial | .30 |
| 8/05/86 | Keywell | Conference with M. Molinaro re 8/4/86 hearing,.... | .80 |
| 8/05/86 | Keywell | Conf. w/M. Molinaro.... | 1.00 |
| 8/05/86 | Molinaro | Meeting with DMP and SBK re preparation for testimony | .50 |
| 8/05/86 | Molinaro | Conference with SBK re status of trial on U.S. Trustee's motion | .30 |
| 8/06/86 | Keywell | Conf. w/M. Molinaro to review chronology re testimony for Trustee's motion, conf. w/M. Molinaro and D. Pelliccioni,.... | 3.00 |
| 8/06/86 | Molinaro | Meeting with DMP and SBK re testimony concerning U.S. Trustee's motion | 1.70 |

The necessity for such work duplication was not demonstrated. The main burden of work on the Project fell on the United States Trustee; there was no apparent need for Mr. Pelliccioni's counsel to assign two lawyers to the motion of the United States Trustee to appoint a full trustee. One-half of the above time will be disallowed as unnecessary and duplicative.[17] Accordingly, thirteen (13) hours are disallowed totalling $1,430,000 (13 @ $110).

Pelliccioni seeks 9.40 [18] hours of attorney compensation for work on this Project. Conferencing with other attorneys at KM & Z accounts for 3.20 hours of this time. This is what clients do with their lawyers, and therefore·this appears to include trustee-type work. Two hours of this time will be disallowed (2 @ $200 = $400).

(iv) *Project D: Communication with the Limited Partners of the Partnerships*

KM & Z has continued to communicate in writing and by telephone with the Limited Partners of the various Partnerships. It has conducted meetings with the Limited Partners to provide information to them and to obtain the votes of Limited Partners on alternatives for the Trustee to follow for resolution of disputes with the Debtor and the future existence of that Partnership.

KM & Z seeks $2,200.00 (20.00 attorney hours) for work on this project. All work on this Project was done by attorney Molinaro. All work was appropriate and is fully allowed.

(v) *Project E: Stabilize Business Operations of Partnerships*

KM & Z assisted the Trustee in stabilizing the business operations of the Partnerships and enhancing the value of properties owned. The work on this Project involved items such as resolving insurance prob-

---

**17.** Where a time entry includes work other than that which is duplicative, only one-fourth of the time entry will be disallowed.

**18.** The time sought is that reported in the Application less 7.80 per KM & Z, and plus 1 hour which the Court determined was not added into the Project total.

lems, reconciling capital contributions to the Partnerships, analyzing the conditions under which a limited partnership may be transferred, supervising completion of tax returns, and assisting the Trustee in listing for sale the properties owned by certain of the Partnerships.

Applicant seeks $2,870.00 (26.90 attorney hours) compensation for work on this Project. The great bulk of the work was done by attorney Molinaro. All work on this Project is found to be appropriate and is allowed in full.

### (vi) *Project F: Respond to Debtor's Plan of Reorganization and Disclosure Statement*

KM & Z reviewed Debtor's Plan of Reorganization and Disclosure Statement solely with respect to matters and representation concerning the Trustee and/or the Partnerships. It prepared a written objection to Debtor's Disclosure Statement, researched the feasibility standards under the Bankruptcy Code, and attended all necessary court hearings relating to the Plan of Reorganization and the Disclosure Statement.

KM & Z seeks $2,858.00 (27.30 attorney hours, .60 paralegal hours) for services rendered in connection with Project F. There does not appear to be any duplication of work, and all work appears necessary. Therefore, all amounts for this Project are allowed.

### (vii) *Project G: Participate in Other Necessary Court Proceeding and Related Matters*

Work on this Project included: attending court hearings in connection with Debtor's obligation to repurchase the interest of the Limited Partners in the respective Partnerships, and reviewing and revising the notice relating to same; prosecuting and ultimately settling the lawsuit against a defaulting Limited Partner in CPPIII; and reviewing and responding to a variety of miscellaneous applications and motions in connection with this case. KM & Z requests $8,933.50 (76.60 attorney hours) for work on this Project.

When two or more attorneys on any given day have an entry that states "attend court hearing", it appears that both attorneys attended the same hearing. Both cannot be allowed in the absence of showing that two lawyers were required in court. KM & Z's fee petition presents such duplicative entries for July 16, 1986 and July 21, 1986:

| | | | |
|---|---|---|---|
| 7/16/86 | Keywell | Attendance at Court hearing, conference with D. Pelliccioni | 1.50 |
| 7/16/86 | Molinaro | Attend cont. hearing re emergency motion for Protection Order | 1.20 |
| 7/21/86 | Keywell | Attendance at court hearing, conference with D. Pelliccioni re: hearing | 4.30 |
| 7/21/86 | Molinaro | Attend court hearing on motion to pay administrative expenses and other emergency discovery matters | 2.00 |

Mr. Molinaro's time for the above entries will be disallowed because of duplication (1.2 + 2.0 @ $110 = $352).

### (viii) *Project H: Prepare Fee Application*

Applicant seeks fees for preparation of their Second Application (the present application is their Third) and filing of a motion to reconsider the allowance made in connection with its First Application. KM & Z seeks $8,091.50 (63.90 attorney hours, 20.50 summer associate hours, 15.60 paralegal hours) for work on this Project.

In the case of *In re Wildman*, 72 B.R. 700 (Bankr.N.D.Ill.1987), this Court found that it was appropriate, in the absence of unusual circumstances, that the hours for preparing and litigating the attorney fee application not exceed three percent of the total hours in the main case. More is not generally necessary or reasonable. Since bankruptcy counsel are entitled to be compensated under § 330 on the same basis as nonbankruptcy counsel, they should likewise keep accurate time records so fees can efficiently be requested. In evaluating the compensation allowed for fee petition work, this Court will look at the total hours worked on the main case. Therefore, the Court will comment on this request hereinbelow while considering the Fourth Application.

(ix) *Project I: Miscellaneous Services*

This work included: advising Trustee as to performance of his duties; assisting Trustee in the preparation of Final Reports on Partnerships II, IV and IX; preparing necessary motions and orders and attending the court hearing on motions to discharge Trustee from his duties upon consummation of settlements involving Partnerships II, IV and IX; maintaining contact with Trustee's co-general partner as to the Partnerships' financial condition and other developments; and assisting the Trustee in responding to inquiries from the Debtor and other parties in interest concerning the operations of Partnerships, the claims of Debtor against the Partnerships and the potential sale of certain properties owned by the Partnerships.

KM & Z seeks $10,139.50 (132.60 hours) for work on this Project. The request is fully allowed.

(c) Expenses Requested

(i) The following expenses are requested:

| | | |
|---|---:|---:|
| Postage: 3–31–86 Mass Mailing | $ | 76.06 |
| 5–31–86 Mass Mailing | | 52.04 |
| Air Courier | | 192.50 |
| Telephone, long distance | | 19.04 |
| Photocopying ($.15 per copy) | | 4,888.05 |
| Secretarial Overtime & Costs | | 240.00 |
| Local Delivery, Messengers | | 1,155.90 |
| Filing Fees | | 29.00 |
| Word Processing—February | −111.00 | |
| March | −139.50 | |
| May | −105.00 | |
| June | −556.50 | |
| July | −210.00 | |
| August | −441.00 | |
| | | 1,563.00 |
| Title Search Charges | | 528.00 |
| Telecopy | | 7.50 |
| Court Reporters Fee | | 137.05 |
| Local Transportation | | 156.00 |
| Mead Data Research | | 83.85 |
| TOTAL | | $9,127.99 |

All the foregoing expenses were reasonable and necessary and will be allowed except for the word processing expense.

As stated in this Court's Second Interim Compensation Order, and hereinabove in discussion of the S & B request, use of in-house word processing equipment is part of secretarial-type overhead expense commonly included in setting attorney hourly billing rates. This request is disallowed in full.

(d) Conclusion

The Court will allow $89,183.50 in fees and $7,564.99 in expenses for the period of February 1, 1986 through August 25, 1986. The amount of fees requested for work done in applying for compensation in not included in the foregoing; that is considered hereinbelow under the consideration of the Fourth Application.

5. *Katten Muchin & Zavis's Fourth Application*

(a) Amount of Fees and Expenses Sought

In its Fourth Application, KM & Z seeks $602,372.75 in fees and $66,509.92 in expenses for the period of August 26, 1986 through June 30, 1988. This period followed Mr. Pelliccioni's appointment as fully empowered trustee.

(b) Specific Requests for Fees

(i) *Project No. 1: Administration of Debtor's Estate*

KM & Z assisted Trustee in obtaining possession and control of Debtor's books, records, and assets. KM & Z assisted Trustee in obtaining new insurance coverage upon finding that the Debtor's insurance coverage was about to be cancelled. Applicant also assisted Trustee in supervising Debtor's employees and independent property managers, and supervised the preparation of the semi-monthly and monthly operating reports. Applicant also was responsible for preparing an index for over 300 storage boxes containing the Debtor's books and records from the closed office in Bloomingdale. KM & Z retained a temporary labor service to prepare the indexes at an hourly rate of $10.40. Applicant seeks $37,820.00 (189.80 attorney hours, 336.70 paralegal hours) for work on this project.

Much of the foregoing work was literally the administration work of a trustee. Trustee-type work is compensated by the trustee's fee, not as part of his attorney compensation even if the trustee's work is performed by those attorneys.

This is particularly the case where, as here, the trustee's fee is substantial. The following are examples of entries which are trustee-type work:

| | | | |
|---|---|---|---|
| 8/27/86 | Molinaro | Telephone calls to N. Dozoryst re insurance and other urgent matters | .30 |
| 8/27/86 | Molinaro | Telephone call to L. Dominguez re insurance problems | .20 |
| 8/28/86 | Molinaro | Letter to Dozoryst re turnover of documents | .30 |
| 8/29/86 | Molinaro | Telephone call to N. Dozoryst re access to Fargo and Jonquil property | .20 |
| 8/29/86 | Molinaro | Letter to K. Crane re insurance matters | .70 |
| 9/4/86 | Molinaro | Meeting with L. Dominguez re closing of bank accounts | .70 |
| 9/5/86 | Molinaro | Meeting with American National Bank people re opening accounts | 1.00 |
| 9/5/86 | Molinaro | Prepare documentation necessary open new bank accounts | .50 |
| 9/15/86 | Molinaro | Conference with E. Deutsch re payment of invoices | .20 |
| 9/16/86 | Molinaro | Analyze Debtor's cash flow | .30 |

Because this Court finds that some of the work done on this Project was trustee-type work, this Court disallows one-quarter of the attorney time requested for attorneys other than Mr. Pelliccioni ($5,537.88).

Mr. Pelliccioni seeks compensation at his attorney billing rate for the following entries:

| | | |
|---|---|---|
| 08/27/86 | Call Near North Insurance re coverage | .20 |
| 09/17/86 | Preparation for and Attend Meeting e/Felton re Crestwood Property Management and Close of Location; C/w Suriano re same conf w/Molinaro | 4.40 |
| 09/18/86 | Calls to and from Amer Natl Bank re checks | .40 |
| 10/16/86 | Calls to and From Caluwaert re Transfer of Documents | .40 |

| | | |
|---|---|---|
| 01/18/88 | C/w MLM, re Collections Agency | .20 |

However, on the summary page for Project 1, Pelliccioni requests only 2.2 hours of compensation ($517.00). This is trustee's work and is therefore disallowed here. The amount allowed to counsel for work on Project 1 is $31,765.12.

(ii) *Project No. 2: Stabilize and Administer Operations of Partnerships*

KM & Z assisted the Trustee in resolving legal issues having to do with insurance problems, capital contributions to the Partnerships, transfer of a limited partnership interest, Partnership tax returns. Applicant also assisted in preparation of certain portions of the Final Reports for the various Partnerships.

KM & Z seeks $17,312.00 (121.10 attorney hours, 68.90 paralegal hours) for work on this Project. Almost 75% of the work was done by attorney Molinaro. It appears all work was necessary, reasonable and valuable. Therefore, the entire amount will be allowed.

(iii) *Project No. 3: Solicit, Negotiate and Evaluate Offers to Purchase Real Estate*

KM & Z assisted Trustee in soliciting offers to purchase real estate owned by Debtor's estate and the Partnerships. KM & Z seeks $18,578.00 compensation (144.80 attorney hours, 2.00 paralegal hours). Mr. Pelliccioni lists 8.00 hours of attorney time. At hearing on this matter, Mr. Molinaro testified that Mr. Pelliccioni's services on this Project had to do with either contacting people who had an interest in purchasing the properties or evaluating the various offers that came in. Mr. Molinaro testified that this was not Trustee time because Pelliccioni was evaluating the legal aspects of the contracts. Mr. Pelliccioni further testified that KM & Z had no real estate partners working on the sale, only two young associates. It is clearly part of a

Trustee's duty to contact people interested in purchasing estate property, and to review offers from these parties. Therefore, one-third ($\frac{1}{3}$) of Mr. Pelliccioni's time on this Project will be disallowed as being trustee work; 2.50 hours will therefore be disallowed (1.50$\$$200 + 1.00$\$$225 = 300 + 225 = \$525 disallowed). The remainder of time on this Project is allowed. Therefore, the amount allowed is \$18,053.00.

### (iv) *Project 4: Obtain Court Approval for Sale of Real Estate*

KM & Z prepared all motions, notices and orders necessary to obtain approval from the Court to authorize the Trustee to enter into the various sales, to retain appraisers in connection therewith and to enter into listing agreements. KM & Z seeks \$19,678.00 (170.30 attorney hours, 5.60 paralegal hours).

Mr. Pelliccioni seeks 18.80 hours of attorney time on this Project. Mr. Molinaro told the Court that this time was primarily spent reviewing various pleadings, orders, and motions after Mr. Molinaro had prepared the documents. Also Pelliccioni testified that he attended the hearing on Crestwood Village because it was a difficult sale and many of the items were still under negotiation when KM & Z came to court for approval of the sale. There is merit to the argument that Mr. Pelliccioni was the only partner looking over the motions presented to the Court and therefore his time was wholly attorney time. All time is therefore allowed. The total amount allowed for Project 4 is \$19,678.00.

### (v) *Project No. 5: Documentation of Sale of Real Estate*

KM & Z prepared all necessary documentation to complete the sales. This docu-

19. The amount requested in the Application was

mentation included the preparation and/or revision of contracts, riders, deeds, bill of sale and closing statements. KM & Z also reviewed the title policies, and surveys. KM & Z seeks \$110,659.75 [19] in compensation for work on this Project.

Mr. Pelliccioni seeks 45.70 hours of attorney compensation. Mr. Molinaro testified that this time related primarily to the sale of Crestwood Village and reviewing the documents prepared in connection with such sale. Mr. Pelliccioni went on to testify that he reviewed the junior real estate associate's work when a senior real estate person was not available. Two real estate partners are included in Project 5 (seeking a total of 12.80 hours), and their work comprised review of the junior real estate associates. One of these real estate partners spent his time exclusively on the Crestwood Village Project (his time totalled 10.80 hours). Since one real estate partner was already reviewing the work on Crestwood Village, it was unnecessary for Mr. Pelliccioni to further review the documents in his legal capacity. Therefore, one-half of Mr. Pelliccioni's time on this Project will be disallowed—22.85 hours disallowed (7.30 @ \$200 + 15.55 @ 225 = \$1,460 + \$3,498.75 = \$4,958.75 disallowed). The balance, \$105,701.00, is allowed.

### (vi) *Project 6: Liquidation of Other Assets of Debtor's Estate*

KM & Z assisted Trustee in the disposition of assets of Debtor's estate other than real estate. Those assets included collection of rent owing by tenants of the various properties, Debtor's personal property, and the liquidation of Debtor's investments. KM & Z seeks \$6,264.50 (55.60 attorney hours, 3.90 paralegal hours) for work on this Project.

Over 92% of the work on this Project was done by Mr. Molinaro and a junior associ-

orally reduced by KM & Z at the fee hearing.

ate. The Court finds that all time on this Project was reasonable and necessary. Therefore, the full amount is allowed.

#### (vii) *Project 7: Class Action Suit Against Winston & Strawn and Others*

According to KM & Z's fee application, its work on this Project included the review of voluminous pleadings and deposition transcripts to become familiar with Class Action work by special counsel prior to Trustee's appointment; responding to multiple requests for document production served upon the Trustee; and analyzing various novel legal issues to assess the relative strength of the competing claims and defenses. Among the legal issues which applicant researched were the duty of counsel to investigate Debtor's compliance with statements contained in offering memoranda; joinder of parties; substitution of trustee as plaintiff; the attorney/client and work product privilege; the ability of the Trustee to serve as a class representative; and the interpretation and application of various provisions of the RICO statute. KM & Z requests $42,146.00 in compensation (380.60 attorney hours, 83.40 paralegal hours).

Ms. Keywell, a senior litigation associate, testified that the research KM & Z conducted was not a duplication of that conducted by Swidler & Berlin. She testified that Swidler & Berlin counsel were very heavily involved in trying to complete discovery. Therefore, Ms. Keywell testified that on some occasions Swidler & Berlin requested assistance of KM & Z with respect to detailed research on the duty of securities counsel, the attorney-client privilege, and whether Churchfield could compel the production of documents used by Winston & Strawn deponents to prepare for a deposition. Ms. Keywell testified that the research conducted in this Project was perceived by herself to be part of the assessment of the Class Action that came under KM & Z's duty as counsel for the Trustee in order to advise the Trustee as to the strengths and weaknesses of the litigation.

Mr. Pelliccioni testified that only a minor portion of the legal research done for this Project was work that Swidler & Berlin requested because of time-deadline emergencies at that firm. He stated that he had to make his own independent determination of how strong the Trustee's claims were before he sat down to negotiate. He further testified that KM & Z did not start from scratch on the research; applicant first inquired of Swidler & Berlin as to what research that firm had done.

▉ To the extent Mr. Pelliccioni sought to educate himself by independent research as to the strengths and weaknesses of his Class Action, such work is not usually the job of a Trustee or his regular counsel. However, here such work was appropriate in the context of the major role that case played in the bankruptcy and the major role that Trustee played in settling that case. However, the research time will be cut by 10% because some portion of the research carried on by KM & Z should have been performed by its three special litigation counsel, and also because first-year associates were used to do the research into sophisticated questions (14.4 @ $60.00 + 3.52 @ $75 = $864 + $264 = $1,128 disallowed). On the latter point, experience tells this Court that first-year law graduates generally perform some useless work that is written off by many firms. In complex areas of law, that is almost inevitable.

Mr. Pelliccioni seeks 34.50 hours of attorney compensation. Much of this time consists of time spent reviewing documents and pleadings, and time spent in conference with other attorneys at KM & Z. This was appropriate legal work and will not be reduced.

A total of $41,018.00 will be allowed for work on Project 7.

#### (viii) *Project No. 8: Negotiation of Settlement of Class Action*

KM & Z assisted Trustee in negotiating settlement of the Class Action suit with

Winston & Strawn, Arthur Evans, Ltd. and third party defendants First American Title Insurance Company and Vescelus & Powell. In this regard, Mr. Pelliccioni personally participated in the discussions along with litigation counsel from his firm. Numerous settlement conferences were held among the parties, both before this Court and outside of Court, at which the Trustee and applicant negotiated a resolution of the Class Action lawsuit. In the course of the settlement negotiation, various proposals were raised involving matters such as indemnification, release, contribution and potential third party claims for which the Trustee required a legal analysis. Applicant also provided direction and assistance to special counsel with respect to the preparation of a lengthy "opening statement" summarizing the Plaintiff's evidence in the Class Action, which was submitted to this Court in connection with the settlement process. The settlement negotiated by the Trustee, on top of net proceeds from Trustee's sale of the other assets of Debtor's estate, will result in the realization by creditors of Debtor's estate of dividends on their respective claims of a size rarely found in bankruptcy proceedings.

KM & Z requests $35,805.00 [20] for work on the negotiation Project. Mr. Pelliccioni requests allowance for 65.30 hours of attorney work for this Project. Mr. Molinaro testified that this work included negotiating with defense counsel in the Class Action regarding the terms of the settlements (as distinguished from actually preparing settlement documents or reviewing those documents) and discussing various aspects of the settlement with Swidler & Berlin's attorneys.

In addition to the KM & Z lodestar requests, it asks for fee enhancement over two hundred thousand dollars for this Project and all other work performed by it. Within enhancement standards discussed in the first part of this opinion, the normal hourly rates of KM & Z will not adequately compensate for this Project. The work performed by this firm in other work areas is adequately compensated by its generous hourly rates. However, the superlative work in this area was absolutely necessary for consummation of the valuable settlement. That work included both the substantive legal-factual evaluation required and outstanding negotiating skills which the Court personally observed. It is rare to see attorneys not directly involved in litigation enter into settlement discussion so deeply and effectively.

Had those discussions failed, such work would have been largely uncompensated as unproductive and of low value. In that sense, the work was risky and unattractive, though such risk does not justify enhancement.

The enhancement standards discussed earlier in this opinion are met for this work because the applicant's normal hourly rates reported for this Project are not adequate compensation for the skill of the work performed and the results obtained. While no evidence of that was offered at the fee application hearings, this Court's personal observations during the settlement negotiations supplied the requisite proof. The requested enhancement is allowed for this work by doubling the hourly rate and total compensation requested for this work. The full amount is allowed for Project 8 plus a $35,805 enhancement.

### (ix) Project No. 9: Obtain Bankruptcy and District Court Approval of Class Action Settlement

KM & Z prepared the necessary motion, notices and orders to obtain authorization from this Court for the Trustee to enter into the Class Action settlement and to obtain preliminary approval by the District Court. Applicant was also responsible for the conduct of the lengthy evidentiary hearing before this Court, and the preliminary approval hearing before the District Court. Upon approval by this Court, KM & Z assisted the Trustee in preparing the necessary documentation of the settlement agreement. KM & Z also acted a mediator when the settlement process broke down repeatedly during negotiations. Applicant

**20.** The amount requested in the Application was orally reduced by KM & Z at the fee hearing.

requests $67,987.50 (491.10 attorney hours, 32.60 paralegal hours).

At the fee hearing, this Court asked Mr. Molinaro several questions about KM & Z's role in preparing a memorandum on standards for approval of settlements versus the role of S & B. Molinaro responded that they prepared the memorandum because:

> ... we had to prepare the documents, so we had to make sure the documents had the various provisions we needed to have in the documents, and number two, we prepared memoranda in connection with the approval of the class action settlement, so we had to have our own basis— our own knowledge of what the appropriate standards were.

> We did converse with Mr. Umana on a very—and Mr. Ferguson, on a very regular basis. We did share our efforts....

> .... I do know that Mr. Herbst spent virtually no tie in settlement.

> .... Mr. Umana, after the first meeting or two, limited his role very extensively, and we sort of took the lead on that end of things.

Mr. Pelliccioni testified:

> As Mr. Ferguson graciously indicated at the first hearing, that in fact, it was our responsibility, and we did take the laboring, or I think the phrase he kept using was to keep his powder dry should the settlement negotiations fall apart and he had to start back up again.

> So I think it is clear that the majority of time was spent by our firm.

> Clearly, Swidler and Berlin participated whenever we needed their help.

> I believe the other two firms, your Honor, spent virtually no time in this regard.

This explanation does show why the Trustee's attorneys devoted so much time to this Project in a complex settlement of a complex case. Mr. Pelliccioni seeks 72.90 hours of attorney compensation. There is merit to his argument that he was the only law partner looking over many of the motions presented to the Court and therefore his time was attorney time. While some of that time might be questioned in other circumstances, the Court is mindful of excel-

lence of the work performed and importance of the result. While the bonus or enhancement of fees requested by KM & Z has been sharply reduced for reasons set forth in this opinion, the Court has given applicant the benefit of the doubt as to all time requested for this work project. The amount allowed for work on this Project is the full $67,987.50 requested.

**(x)** *Project No. 10: Hallmark & Johnson Suit*

KM & Z represented Trustee as defendant in a suit commenced by Hallmark & Johnson. That action sought to enjoin sale by Trustee of two apartment buildings owned by Partnership V. The Court held that Hallmark & Johnson failed to establish any basis to enjoin that sale. Moreover, the Court granted KM & Z's motion for sanctions against Hallmark & Johnson. Ultimately, applicant agreed to settlement whereby Hallmark & Johnson would pay the sum of $4,604.00 to KM & Z on account of costs incurred in that matter. KM & Z now seeks $10,160.50 (61.20 attorney hours, 6.8 paralegal hours).

Mr. Molinaro testified that both he and Ms. Keywell (a litigation attorney) attended the hearings because it involved both litigation and bankruptcy aspects of what the court had done or had not done.

All time in this category appears necessary and therefore it will all be allowed. However, the amount KM & Z is presently allowed to recover will be decreased by the amount of the sanction settlement that it received from Hallmark & Johnson. Therefore, KM & Z can presently recover only $5,556.50 for Project 10.

**(xi)** *Project No. 11: Crescent Investment Corporation and DuPage Bank Suit*

Prior to appointment of Trustee, DuPage Bank and Trust Company filed a motion seeking allowance of an administrative claim in excess of $200,000.00 in connection with a lease of office furniture and equipment between Crescent Investment Corporation, as lessor, and Debtor, as lessee. DuPage had loaned monies to Crescent so that Crescent could purchase the office fur-

niture and equipment from Debtor and then enter into the leaseback transaction. DuPage asserted a claim against Debtor's estate as the collateral assignee of Crescent.

On behalf of the Trustee and Debtor's estate, KM & Z initiated as adversary proceeding against Crescent seeking to set aside the sale-leaseback transaction, or alternatively to subordinate the claim against Debtor's estate related thereto on the basis of breach of fiduciary duty, fraudulent conveyance and/or equitable subordination. Subsequent to a settlement conference with the Honorable Robert E. Ginsberg acting as a mediator, the parties agreed to a settlement whereby DuPage would be allowed an administrative claim in the amount of $75,000.00 and all office furniture and equipment would be returned to Debtor's estate.

KM & Z seeks $63,568.00 in compensation (522.30 attorney hours, 38.90 paralegal hours).

Pelliccioni seeks 9.7 hours of compensation. Ms. Keywell testified that the lead litigation attorney on the suit reported to Pelliccioni and discussed litigation strategy with Pelliccioni and took his marching orders from Pelliccioni. The Court finds, however, that Mr. Pelliccioni role was that of a Trustee and not an attorney. The lead attorney on this Project is a senior attorney at KM & Z and the Estate should not pay for his work to be reviewed by another senior member of the firm. Mr. Pelliccioni's time is disallowed in its entirety ($2,215.00). KM & Z seeks compensation for eight other attorneys working on this Project.

As often stated in this opinion, the proof of the value of a law suit effort lies in its results. Although the results of KM & Z's adversary against Crescent were good they were not so superb as to merit eight attorneys working on the suit, and attorney fees of over $60,000.00. Therefore this Court will order a further $5,000.00 reduction because of excess staffing and a result not meriting a recovery as high as requested. A total of $56,353.00 is allowed for Project 11.

(xii) *Project No. 12: Suit to Avoid Preferential Transfers, Fraudulent Conveyances and Post–Petition Transfers*

KM & Z brought a complaint of 30 counts to set aside alleged preferential transfers, fraudulent conveyances, and post-petition transfers. During the course of the Class Action settlement, it was agreed that all Counts, except Count 30, would be assigned to Winston & Strawn. Such assignment was made. KM & Z completed the prosecution of Count 30, with most defendants accepting the Trustee's proposed settlement. One defendant went to trial, and the Trustee prevailed. Applicant seeks $32,012.50 (376.90 attorney hours, 10.90 paralegal hours). It is fully allowed.

(xiii) *Project 13: Fargo Property Suit*

KM & Z became aware, upon review of Debtor's books, that Debtor had granted numerous Money Market Mortgages to investors secured by apartment units. KM & Z formed the belief that such mortgages were unenforceable. The Trustee then elected to file a test case seeking to question the validity of the mortgages on the apartment units. Applicant prepared, filed and served the complaint and all other pleadings on behalf of the Trustee. Applicant also assisted Trustee in negotiations with counsel for the First Secured Creditors' Committee and Second Secured Creditors' Committee. Following negotiations, the Trustee agreed to a settlement whereby 65% of the proceeds from the sale of apartment properties would be distributed to holders of first and second Money Market Mortgages thereon and 35% would be distributed to Debtor's estate for the benefit of all creditors. KM & Z seeks $10,936.00 (80.90 attorney hours, 12.00 paralegal hours) for work on this Project.

Eighty-five percent (85%) of the time billed for this Project was billed by Mr. Molinaro and another mid-level associate. The work performed was all legal work. All such work was reasonable and necessary; therefore, all is allowed.

(xiv) *Project No. 14: Other Adversary Proceedings*

KM & Z represented Trustee on behalf of Debtor's estate in all other adversary proceedings in this case. Those proceedings included miscellaneous personal injury lawsuits filed against Debtor, an adversary proceeding initiated against Debtor, and a suit against Debtor's estate in connection with the personal property located at the Crestwood Village Complex. KM & Z requests $1,052.00 (12.30 attorney hours). All time is allowed.

(xv) *Project No. 15: Formulate, Negotiate and Document Settlements Between Partnerships and Debtor*

Prior to August 26, 1986, applicant assisted Trustee in the formulation, negotiation and documentation of settlements between seven (7) of the Partnerships and Debtor, which settlements provide for either the sale or refinancing of the properties owned by each of the Partnerships. After August 26, 1986, KM & Z assisted the Trustee in the formulation, negotiation and documentation of the settlement between Debtor's estate and Partnership X. This settlement resulted in the sum of $412,655.38 being paid by Partnership X to Debtor's estate. KM & Z request $5,804.00 (47.50 attorney hours).

Mr. Molinaro's work accounts for 97% of the time. The Court finds the work on this Project both reasonable and necessary. Therefore, all the time sought for this Project is allowed.

(xvi) *Project No. 16: Communications with Money Market Mortgage Holders, Limited Partners and Other Parties in Interest*

KM & Z communicated in writing and by telephone with the Limited Partners of the various Partnerships concerning: (1) the nature and extent of the disputes between the Partnerships and Debtor and alternatives to resolve these disputes; (2) the financial condition of the Partnerships and the physical condition of their properties; (3) the status of the Winston & Strawn litigation and Debtor's obligation to repurchase the interests of the Limited Partners in the Partnerships; and (4) the status of Debtor's Chapter 11 proceeding in general. In addition KM & Z attended a partnership meeting on Partnership X in an effort to obtain the vote of partners as to which alternative to follow for resolution of disputes. Applicant requests $23,822.50 for work on this Project (97.90 attorney hours, 252.50 paralegal hours).

Over 95% of the attorney time is that of Mr. Molinaro. It appears all time was necessary and therefore the full amount will be allowed.

(xvii) *Project No. 17: Representation of Trustee at all Other Court Hearings*

KM & Z represented the Trustee at all other court hearings involving this proceeding. These hearings included motions filed by creditors to modify the automatic stay, motions to conduct an examination pursuant to Bankruptcy Rule 2004, motions to authorize the Trustee to enter into insurance premium finance agreements, Debtor's appeal of the appointment of the Trustee, and hearings to retain attorneys, accountant, special counsel and others on behalf of Debtor's estate or the Trustee. KM & Z requests $13,769.00 (133.10 attorney hours, .2 paralegal hours).

KM & Z lists nine attorneys working on this project. Since this Project combines several different matters no reduction will be made for excessive staffing. All time will be allowed with the exception of 2½ hours of Mr. Pelliccioni's time (2½ $ $200 = $500), because the following time entry combines trustee time with attorney time:

10/23/86 Conf w/Keywell, Conf w/Umana, prepare for and attend meeting w/Sullivan & Marmer; Conf w/Keywell, Molinaro and Umana 5.80

Therefore, $13,269.00 will be allowed.

(xviii) *Project No. 18: Analyze Claims Against Debtor's Estate and Prepare Distributions to Creditors*

KM & Z assisted the Trustee in review of claims against Debtor's estate. Approximately 1,400 claims have been filed in this proceeding. However, many claimants

have multiple claims against Debtor's estate. Accordingly, there were in excess of 4,000 Money Market Mortgage investments which needed to be reviewed and verified. To resolve the claims, KM & Z developed a claims letter which applicant states has resolved about 95 percent of the Money Market claims. Applicant also assisted the Trustee in preparing motions, orders and notices necessary to establish various bar dates. KM & Z has also filed objections to over 225 duplicative claims. Applicant seeks $23,555.50 (178.50 attorney hours, 63.30 paralegal hours) for work on this Project.

Mr. Pelliccioni seeks 13.80 hours of compensation for participation, review, and supervision of these matters. It appears that his work was partly legal, partly trustee work. One-half of his work (6.9 hours $ $200 = $1,380) will therefore be disallowed as trustee's work. KM & Z is allowed $22,175.50 for work on this project.

### (xix) *Project No. 19: Preparation and Confirmation of Plan of Reorganization*

KM & Z assisted the Trustee in the negotiation, formulation and documentation of a liquidating plan of reorganization and the disclosure statement related thereto. KM & Z also prepared the necessary motions, notices and orders to seek and obtain approval of the disclosure statement and confirmation of the plan. Applicant seeks $34,684.50 in compensation (239.60 attorney time, 20.20 paralegal time).

A junior associate performed nearly 20 hours of research for this Project. Mr. Molinaro testified that this time consisted of research on whether a class who did not vote at all could be deemed to have accepted the plan, and possibly included research on cram-down standards. This Court finds that 20 hours of research on this Project was excessive and unnecessary for experienced bankruptcy counsel. Therefore, the Court will disallow 5 hours of research (5 $ $70.00 = $350.00).

Mr. Pelliccioni lists 48.80 hours of attorney time. The bulk of this time appears to be spent reviewing the plan and disclosure statement, and conferencing with other attorneys at KM & Z regarding these documents. There is merit to the argument that Mr. Pelliccioni was the only partner reviewing and supervising documents presented to the court and therefore such time was attorney time. Given the complexity of the matters to be analyzed and work to be performed, it was certainly necessary that a senior bankruptcy lawyer supervise it. In the light of the magnitude of financial matters at stake, his hours reported were not excessive.

The Court will therefore allow $34,334.50 for work on Project 19.

### (xx) *Project No. 20: Review and Object to Fee Applications*

This Court has advised Trustee on more than one occasion that a Trustee is responsible for reviewing all administrative claims, including applications for compensation filed by professionals. KM & Z assisted the Trustee in his analysis and review of all fee applications filed in this proceeding. Based on such analysis and review, KM & Z objected to many fee applications. Those applications were both bulky and large in amount. The KM & Z work in that regard was helpful to the Court. KM & Z also appeared at all fee hearings and prepared the consolidated notices to creditors relating thereto. KM & Z requests $6,920.00 (86.00 attorney hours, .7 paralegal hours) for work on this Project.

Mr. Molinaro and a junior associate account for over 95% of the time in this category. This work is wholly allowed.

### (xxi) *Project No. 21: Trustee's Fee Application*

KM & Z assisted the Trustee in the preparation of his fee applications. KM & Z prepared a separate application for each of the partnerships and a separate application for the Trustee for his services solely in connection with Debtor's estate. In addition, applicant responded to inquiries and objections to the Trustee's fee applications. KM & Z seeks $3,000.50 (32.10 attorney hours) for work on this Project. This time is excessive in the light of the content of

these applications, and one quarter of it (8 hours, $747.79) is disallowed. The balance is allowed.

(xxii) *Project No. 22: Preparation of Other Fee Applications*

KM & Z prepared fee applications on behalf of Spicer & Oppenheim, accountants for the Trustee, and also for Marshall Nachbar & Company, auctioneer for the Trustee. While those parties have provided their own detailed description of services, KM & Z prepared the narrative portion of each application. KM & Z seeks $2,024.00 (25.40 attorney hours, 1.20 paralegal hours) for work spent on this project. Again, the time is excessive for the work performed, and one quarter of it (6 hours, $465.35) is disallowed. The rest is allowed.

(xxiii) *Project No. 23: Applicant's Fee Application*

■ KM & Z seeks compensation for time spent preparing and litigating its Third and Fourth Fee Application. KM & Z seeks $10,067.50 (66.90 attorney hours, 26.90 paralegal hours) compensation for work on this Project within the Fourth Fee Application. It requested $8,091.50 for such work in its Third Application. As stated in the discussion of KM & Z's Third Fee Application, in the absence of unusual circumstances the hours for preparing and litigating the attorney fee applications should not exceed three percent of the total hours. In this Court's Second Interim Compensation Order, $2,391.00 was allowed for preparation and litigation of KM & Z's First Fee Application.

Since KM & Z has been allowed a lodestar total of $756,231.48 in fees for its work passed on here, this Court would allow a maximum of 3% or $22,686.94 for work on KM & Z's First, Second, Third and Fourth Fee Application. The fees requested in Applications Three and Four, for fee petition preparation and litigation, apparently do not include all work for preparation of the instant application. However, the full amounts now requested will be allowed since the amounts already received ($2,351.00) and the amounts presently requested ($8,091.50 and $10,067.50) total less than the maximum recovery ordinarily allowed by this Court for such work, and all work appears reasonable and necessary. However future applications by this firm should not seek additional compensation for preparing applications passed on here.

(xxiv) *Project 24: Miscellaneous Services*

KM & Z performed a variety of miscellaneous functions, including (a) filing pleadings with the Court, and (b) researching the ability of Money Market Mortgage holders to transfer their promissory notes currently held in Individual Retirement Accounts and preparing documentation for such transfer. KM & Z seeks $4,745.50 (16.10 attorney hours, 78.10 paralegal hours) in compensation for work on this project.

The Court finds all time was reasonable and necessary. Therefore, all time on this Project is allowed.

### c. Expenses Requested

KM & Z seeks the following expenses:

| | |
|---|---:|
| UCC Searches | $ 287.85 |
| Title & Recording Fees | 187.00 |
| Witness Fees | 149.40 |
| Word Processing | 440.50 |
| Summon Fees and Costs | 211.50 |
| Certified Copies | 148.75 |
| Lexis Charges | 990.70 |
| Court Reporter & Transcripts | 2,171.75 |
| Local, Express Mail & Air Courier Deliveries | 9,660.83 |
| Long Distance Telephone | 1,328.02 |
| Local Transportation | 116.39 |
| Business Meals | 147.38 |
| Telecopy Costs | 312.50 |
| Postage (Mass Mailings) | 3,111.88 |
| Publication Costs | 52.50 |
| Secretarial Overtime & Costs | 2,984.00 |
| Outside Copying | 9,976.62 |
| Photocopying at Firm ($.15 per copy) | |
| 1986 | |
| August | $ 8.70 |
| September | 760.65 |
| October | 859.05 |
| November | 1,794.45 |
| December | 1,665.15 |
| 1987 | |
| January | 891.60 |
| February | 2,121.00 |
| March | 1,464.45 |
| April | 1,258.58 |
| May | 1,377.00 |
| June | 849.45 |
| July | 484.80 |
| August | 542.70 |
| September | 597.75 |
| October | 930.15 |
| November | 2,086.50 |
| December | 1,563.30 |

| 1988 | | |
|---|---|---|
| January | $ 674.25 | |
| February | 164.85 | |
| March | 457.05 | |
| April | 686.70 | |
| May | 1,436.10 | |
| June | 3,219.45 | |
| | $25,893.68 | 25,893.68 |
| Temporary Labor Service | | 6,293.60 |
| Closing and Filing Fees | | 1,761.20 |
| Copying at Court or Library | | 199.45 |
| Change of address Charges | | 84.50 |
| TOTAL | | $66,510.00 |

All of these expenses will be allowed except those claimed for word processing.

As stated in this Court's Second Interim Compensation Order, the use of in-house word processing equipment is part of secretarial-type overhead expense included in attorney hourly billing rates. Such claim ($440.50) is therefore disallowed in full.

This Court will allow $66,069.50 in expenses.

### (d) Conclusion

On the Fourth Application, this Court will allow fees in the amount of $582,-535.48, and expenses in the amount of $66,-069.50 for the period of August 26, 1986 through June 30, 1988. The Court will also allow an enhancement of $35,805.00 for outstanding work performed on the negotiation of the Class Action Settlement.

### 6. *Total Amount Due KM & Z*

After credits for payments recovered by it during the case, KM & Z is presently entitled to the following amounts less $485,000.00 which was recently paid to KM & Z as interim payment:

| | | |
|---|---|---|
| a. | Amount previously allowed for payment but not yet received. | $ 13,105.35 |
| b. | Amount previously tentatively approved but not allowed for payment. | 16,902.50 |
| c. | Amount allowed in Third Application. (fees and expenses) | 96,748.49 |
| d. | Amount allowed in Fourth Application. (fees and expenses) | 648,604.98 |
| e. | Enhancement allowed for Project No. 8 (Fourth Applications). | 35,805.00 |
| | Total | $811,166.32 |

Thus less the $485,000.00 just received, KM & Z is presently entitled to $326,166.32.

KM & Z has requested a bonus or enhancement far larger than that awarded for Project No. 8. However, it has not met the requisite standards for that except to the extent enhancement is allowed for Project No. 8. While the additional bonus requested must be denied under standards set by higher authority, such denial is not intended to detract from the excellent work performed by this firm in all regards. This ruling merely recognizes that most of such work is adequately compensated at usual historic hourly rates of the firm. Moreover, this Court's allowance of some attorney time which might more correctly be compensated as trustee time gives the benefit of the doubt for those areas to these lawyers because of the excellence of their work.

### G. TRUSTEE FEE APPLICATION

#### 1. *History of Applicant*

The Trustee for Debtor does not seek enhancement or multiplier as did those applicants discussed above, but his application is necessarily discussed here in conjunction with that of his law firm. Prior to filing of this proceeding, Churchfield Management & Investment Corporation had been engaged in the business of owning, developing, syndicating and managing real estate located throughout northern Illinois. As part of its business operations, Churchfield organized eight limited partnerships to which it sold certain residential real estate. Pursuant to an Agreed Order dated October 19, 1984, the United States Trustee appointed Daniel M. Pelliccioni as limited trustee in this case to exercise the rights and powers and to perform the duties of Debtor as a general partner or co-general partner in Churchfield Properties Partnerships I, II, III, IV, V, VI and IX. Subsequently, the Court determined that cause existed for the appointment of a fully empowered trustee for Debtor's entire estate and directed the United States Trustee to appoint a trustee for such purpose. Thereafter, the Court approved the appointment of Daniel M. Pelliccioni as Trustee for the entire estate, with partnership rights in the aforementioned partnerships, and Partnership X. It is his work for the Debtor's estate that is dealt with here. His applications relating to the Churchfield Partnerships will be dealt with in a future opinion under preparation.

Upon appointment, Mr. Pelliccioni took possession of all of Churchfield's property and supervised the operation of its business while commencing an orderly liquidation of Churchfield's assets. While he did not personally manage the real estate, the Trustee analyzed and administered all of the financial and legal affairs of Churchfield, including the prosecution of various causes of action. Pursuant to order dated January 8, 1988, the Court confirmed the Trustee's Second Amended Liquidating Plan of Reorganization. Under the Plan, Trustee has now completed liquidation of all assets of Churchfield.

In his capacity as Trustee for Churchfield Management & Investment Corporation, Mr. Pelliccioni obtained and administered the following funds for distribution to creditors:

1. $2,332,000 in cash that the Trustee was holding for distribution to creditors of CMIC as of June 30, 1988 (which amount excludes funds held by the Trustee in reserve accounts relating to sale of properties owned by the Partnerships);

2. $9,274,484 in funds distributed by the Trustee since his appointment was approved on August 26, 1986; and

3. $10,520,000, representing proceeds from the class action lawsuit discussed earlier in this opinion.

Thus, the Trustee for Debtor has administered and will complete administration of $22,126,484 in total.

### 2. *Trustee's Fee Request*

The Trustee has previously received $42,-500 from the proceeds of sale of the Crestwood Village Complex. He presently requests the maximum fees permitted under 11 U.S.C. § 326 for work as Trustee for Debtor's Estate, and also for his work as Trustee for Partnerships I, II, III, IV, V, VI, IX, and X, in the following amounts:

| | | |
|---|---|---|
| 1. | Estate | $222,144.00 |
| 2. | CPPI | $ 5,480.00 |
| 3. | CPPII | $ 16,167.37 |
| 4. | CPPIII | $ 7,151.00 |
| 5. | CPPIV | $ 12,731.34 |
| 6. | CPPV | $ 23,790.86 |
| 7. | CPPVI | $ 18,129.82 |
| 8. | CPPIX | $ 8,878.29 |
| 9. | CPPX | $ 8,557.71 |

As previously noted, the requests as to the partnerships will be discussed in a later opinion.

### 3. *Standard of Fee Award*

The maximum compensation for trustees is calculated by a percentage of the moneys brought into the estate by the trustee's services. Section 326(a) of the Bankruptcy Code now provides:

In a case under chapter 7 or 11, the court may allow reasonable compensation under section 330 of this title of the trustee for the trustee's services, payable after the trustee renders such services, not to exceed fifteen percent on the first $1,000 or less, six percent on any amount in excess of $1,000 but not in excess of $3,000, and three percent on any amount in excess of $3,000, upon all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor but including holders of secured claims.

However, the above section is applicable only to cases filed 90 days after the July 10, 1984 date of amendment to § 326(a). This bankruptcy case was filed before that date. Therefore the earlier version of § 326 applies to allow the following as a maximum:

[F]ifteen percent on the first $1,000 or less, six percent on any amount in excess of $1,000 but not in excess of $3,000, and three percent on any amount in excess of $3,000 but not in excess of $20,000, two percent on amount in excess of $20,000 but not excess of $50,000, and one percent on any amount in excess of $50,000.

The Trustee has therefore requested the maximum under the latter provisions.

Section 326 sets limitations on but not the standards for fee awards to trustees. Standards are set by § 330(a)(1), a provision setting the standard for attorneys and all professionals as well as trustees. It provides that "the court may award to a trustee ... reasonable compensation for actual, necessary services rendered by trustee ... based on the nature, the extent, and the value of such services, the time

spent on such services, and the cost of comparable services...." *See, Cavazos v. Simmons,* 90 B.R. 234 (N.D.Texas 1988); ("... the court holds today that compensation awarded pursuant to § 330(a)(1) to a chapter 7 trustee for the trustee's services is subject to the maximum limits of § 326(a)...."; *In re Savage,* 67 B.R. 700 (D.R.I.1986)) ("Subject to this sliding scale [§ 326(a)], the court is authorized, upon notice and hearing, to award a trustee 'reasonable compensation for actual, necessary services rendered....'.... reasonableness is to be 'based on the nature, the extent, and the value of such services, the time spent on such services and the cost of comparable services....'. ....")"; *In re McCombs,* 33 B.R. 387 (E.D.Mo.1983); and L. King, 2 *Collier on Bankruptcy* ¶ 326.01 (15th ed. 1988) ("... [S]ection [326(a)] does not authorize compensation of trustees. Rather, it fixes the maximum compensation of a trustee. Section 326(a) provides that ... the court, pursuant to section 330 of the Code, may allow reasonable compensation to the trustee for the trustee's services....")

Furthermore, § 326(a) does not provide a minimum fee which trustees are to be awarded, rather it provides the maximum fee a court may award. The House noted the following in its report on proposed § 326 which became the present § 326:

> This section is derived in part from section 48c of the Bankruptcy Act. It must be emphasized that this section does not authorize compensation of trustees. This section simply fixes the maximum compensation of a trustee. Proposed 11 U.S.C. 330 authorizes and fixes the standard of compensation. Under section 48c of current law, the maximum limits have tended to become minimums in many cases. This section is not intended to be so interpreted. The limits in this section, together with the limitations found in section 330, are to be applied as outer limits, and not as grants or entitlements to the maximum fees specified.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 327, 1978 U.S.Code Cong. & Admin.News, 5787, 6283.

■ Notably one of the standards found in § 330 is, "the time spent on such services". The law is sparse concerning whether a trustee is required to file time records with the court as attorneys are required to do under the same provisions of § 330(a)(1). Of those courts that have dealt with that issue there is a split of opinion both as to the requirement under former 48c of the Bankruptcy Act and the requirement under § 326(a) of the present Bankruptcy Code. Since Trustee Pelliccioni kept time records for his work as attorney but kept no time records for his work as Trustee, authority on this issue must be considered.

*In re Photon,* 26 B.R. 693, 703 (Bankr.D. Mass.1982) stated that under the Act, "[a]llowances to bankruptcy officers are computed from accurate records of services performed." However, the Seventh Circuit found to the contrary in *In re Midwest Engineering and Equipment, Co.,* 440 F.2d 326, 329 (7th Cir.1971). The Seventh Circuit held that, "[w]e know of no requirement that such a time schedule be filed. The trustee's compensation is by statute based upon the value of the assets which come into his hands." The Seventh Circuit appeared to hold that former § 48c established a minimum trustee fee. In light of the legislative history of the present § 326, which was intended to reform prior law, that holding cannot be authority for an analysis of § 326.

*In re Doctors, Inc.,* 4 B.R. 346 (Bankr.E. D.Pa.1980), also found under the Bankruptcy Act that the trustee had no duty to keep an accurate record of the hours spent in performing his duties as fiduciary. Nevertheless, the court recognized its duty to look at time spent by holding that the trustee's estimate of his time spent had probative value in determining the fees to be awarded to him.

Under the Bankruptcy Code, there is also a split of authority as to the requirement of time records from the trustee. *In re Santoro Excavating,* 58 B.R. 131 (Bankr.S.D. N.Y.1986), a case where the trustee retained her law firm as attorney for the

estate, the court held that the fee applicant "should not have kept any time records for work performed by the trustee because trustees are compensated on the basis of commissions, not time expended." On the other hand the court found that, "[t]he applicant's statement and the accompanying imprecise summarization of which activities were attributable to its services *qua* attorney points to the extreme importance of keeping contemporaneous time records that are complete enough to dispel such confusion *ab initio.*" *Santoro*, 58 B.R. at 132 (emphasis in original).

In *In re Missionary Baptist Foundation of America*, 77 B.R. 552, 554 (Bankr. N.D.Tex.1987), the court held that:

.... While it might be desirable for a Trustee to have the same type of time records as are presented in connection with an application for attorney's fees, this Court does not feel that a Trustee in order to recover compensation upon which there are maximum limits by the statute should be held to the same record-keeping requirements as an attorney.

The court opined without explanation that because a trustee's time is spread through the entire case, rather than identified to a particular project, it is not realistic to expect the trustee to prepare a time slip on each function that he or she performs.

This Court cannot agree that it is difficult for a trustee who is also his or her own attorney to keep time records for work as trustee in the same way that time is kept for attorney work. In the modern world of computer billing, time is recorded contemporaneously by each professional and paraprofessional. If the firm's software program is properly planned, each time entry will be keyed to some particular task. In the course of measuring the minutes of their work lives in professional time entries, why is it difficult to enter time into one or more categories for "trustee work"?

Trustee time records were found mandatory in *In re Roco Corp.*, 64 B.R. 499 (D.R.I.1986). The court held:

11 U.S.C. § 330(a) speaks of "reasonable" compensation, and seeks to mea-sure it based on a variety of factors. "Time" is one of those factors—a critically important one at that. There is simply no way accurately to measure the amount of time reasonably, necessarily, and productively expended in the absence of a proffer of detailed contemporaneous time records by the applicant....

. . . .

It matters little that [the] application is for a trustee's commission as opposed to an award of counsel fees. In either event, § 330(a) by its express language applies, and time reasonably and productively spent becomes a key ingredient of the fee-setting recipe.

. . . .

Without the time-and-hours data which the trustee, as an applicant for fees, was duty bound to furnish, the bankruptcy judge had little choice but to treat [the] petition with great conservatism....

*Roco Corp.*, 64 B.R. at 503–04.

The *Roco Corp.* holding has logic and properly recognizes that the statutory standard for trustees is the same as that for attorneys for whom time entries have long been required. Moreover, particularly where the trustee is also his own attorney, the maintenance of separate attorney and trustee time records can be most helpful in distinguishing between work to be compensated as an attorney and that to be compensated as trustee—helpful to the court, and helpful to the trustee in preparing applications for compensation. However, two considerations must limit that conclusion. First, in small estates a court does not always need time records for trustee's work in order to differentiate between trustee and attorney work, or to evaluate the trustee's work. Second, in this District and many other Districts, time records have rarely been required for trustees. While this Court has often cautioned trustee-lawyers to keep time records separately for attorney and trustee work, no such advice was given in this case.

It must be concluded, in fairness to trustees on whom the courts have rarely im-

posed the obligation for time records, that no absolute requirement for trustee time records has yet been imposed. However, it remains the burden of the trustee-lawyer to separate out trustee work from attorney work in applications for compensation, and to demonstrate under § 330 the "time spent on such [trustee] services ..." Keeping a separate time record would seem to be in the best interests of the trustee in every case where he or she is also employed as counsel. In large cases such as this, that is the only way to meet trustee's burden and will be expected by this Court henceforth.

■ In the instant case, Mr. Pelliccioni showed that he spent approximately 400 hours on his role as limited trustee, i.e., trustee for Partnerships I, II, III, IV, V, VI and IX. After his appointment as trustee for Debtor's entire estate, Mr. Pelliccioni showed that he spent almost 700 hours which amounts to approximately 350 hours per year (6.75 hours per week). While those were estimates and no time records supported them, this is not an unexpected assertion of time in the light of his considerable responsibility for many problems during this period. Indeed, this Court personally observed Mr. Pelliccioni's heavy work as trustee and his many appearances in court in performance of that function.

Nonetheless, because he has not kept time records for his work as Trustee, we have only his narratives in attorney and trustee applications to guide us in distinguishing between his accomplishments as Trustee from those as attorney. The Trustee narrative paints with a broad brush, and does not distinguish precisely his work as Trustee from that as an attorney. The Trustees application states the following:

Upon appointment, the Trustee took possession of all CMIC's property and operated its business while commencing an orderly liquidation of CMIC's assets. As more fully described in the Fourth Application by Attorneys for Trustee and Reimbursement of Expenses, the Trustee also analyzed and administered all of the financial and legal affairs of CMIC, including the prosecution of various causes of action.

Pursuant to Order dated January 8, 1988, the Court confirmed the Trustee's Second Amended Liquidating Plan of Reorganization ("Plan"). The Trustee has completed the liquidation of virtually all assets of CMIC pursuant to the Plan.

Being unable to show hours performed, Mr. Pelliccioni is unable to distinguish precisely the value of his services as Trustee from those as attorney. There is some risk on this record of compensating him twice for the same work, once as a lawyer, again as trustee. The Court is unwilling to minimize his excellent service as Trustee in this case by a major disallowance. However, the statute must be given weight, and trustees must assist the court and themselves by keeping time records at least in major cases. In cases such as this, they should keep sufficient records to distinguish between trustee and attorney work. Furthermore, Mr. Pelliccioni has failed to show "the cost of comparable services" under § 330, which in this case might relate to his oversight of real estate management. Lastly, he has not differentiated in the two applications between work as trustee and his firm's work, and the Court has disallowed as trustee-type work only a handful of the hours requested in KM & Z's application. Accordingly, $2,000.00 of the request for trustee compensation is disallowed for reasons stated above.

Based on the funds administered in this Estate, the Trustee requests the following fee for work as Trustee for the Estate:

| | |
|---|---|
| 15% of first $1,000.00 | $ 150.00 |
| 6% of next $2,000.00 | 120.00 |
| 3% of next $17,000.00 | 510.00 |
| 2% of next $30,000.00 | 600.00 |
| 1% of balance of $22,076,484.00 | 220,764.00 |
| TOTAL | $222,144.00 |

The Trustee has done an outstanding and effective job in carrying out his duties. He assumed enormous responsibilities and discharged them most effectively. All but the $2,000 disallowed is approved.

The Trustee also requests expenses of $5,000 consisting of the premium for the bond maintained by him pursuant to § 322. Such amount is allowed in full.

### 3. *Conclusion as to Trustee*

The Court will allow fees to Mr. Pelliccioni as Trustee of the Debtor in the amount of $220,144.00 less amounts previously received ($42,500.00 + $110,000.00). The Court also allows $5,000.00 in expenses. Thus, the Trustee is presently entitled to receive $72,644.00. However, since some tasks of Trustee remain to be completed and the instant allowance assumes final completion of all his Trustee responsibilities, $10,000 is to be held back from payment until his work is completed. The balance should be paid now.

### H. CONCLUSION

By separate order, the Trustee's counsel is required to prepare and present individual and separate judgment orders in accord with and pursuant to the foregoing rulings. Each will be certified to permit immediate appeal. Each order will also provide that amounts for fees and expenses requested but not allowed are disallowed for reasons stated in this Opinion.

Further opinions as to all remaining and pending fee applications are in preparation and will shortly be issued.